**Chris McCLELLAN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 92–CF–1522.

District of Columbia Court of Appeals.

Argued April 18, 1996.
Decided June 19, 1997.

Mindy Daniels, appointed by this court, Washington, DC, for appellant.

Diana Harris Epps, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Michael L. Volkov, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN and FARRELL, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

Appellant McClellan urges that his conviction of first degree murder and related weapons offenses be reversed because of the following claimed trial court errors: (1) allowing an eyewitness to the crime to testify for the government while denying the defense the right to cross-examine that witness for bias in one particular when the witness invoked his Fifth Amendment privilege against self-incrimination; (2) allowing testimony that two witnesses (who were sisters) and their family had moved to North Carolina because of their fear of testifying against McClellan; (3) failing to grant a mistrial when the prosecutor, in closing argument, improperly suggested that the jury could use the witnesses' move to North Carolina, out of fear, as a basis for believing that one of them could, but would not, identify McClellan as the murderer; and (4) improperly admitting prior consistent grand jury testimony. We are satisfied that the trial judge made a reasonable and permissible accommodation between the appellant's right to confront a witness against him and the witness' Fifth Amendment privilege to refuse to incriminate himself by testifying about an offense different from the one being tried. Although some of the prosecutor's comments in closing argument were impermissible, the jury could readily evaluate and discount them in deciding the case. The other

claimed errors do not warrant reversal. Therefore, we affirm.

## I.

After a jury trial on September 10–17, 1992, Chris McClellan was convicted of the first degree murder while armed of Leonard Cole, III, D.C.Code §§ 22–2401, –3202 (1989); of carrying a pistol without a license, id. § 22–3204(a); and of possession of a firearm during a crime of violence, id. § 22–3204(b). The trial court sentenced McClellan on December 1, 1992, to a total of twenty-one years to life in prison. This timely appeal followed.

We set forth the facts in some detail in order to provide the basis for our conclusion that there was no violation of the Confrontation Clause—McClellan's principal claim on appeal—because McClellan had an adequate opportunity to demonstrate witness Wayne Smith's bias against him.

Wayne Smith testified that on the afternoon of September 12, 1991, he and Shantia Moore, Moore's sister Ayanna Grant, and Leonard Cole drove by Dunbar High School. Shantia Moore was driving, Ms. Grant was in front, and the two men were in the back seat. As they drove by, Smith noticed McClellan and a group of his friends standing outside the school. Smith testified that McClellan was wearing "a loose shirt collar[,] ... a navy blue shirt with white stripes, short sleeve[s]." McClellan yelled obscenities at the four in the car, and Cole responded in kind. Smith saw McClellan jog about fifteen steps toward the car while brandishing a silver handgun. From a distance, according to Smith, it "looked like a .45." McClellan then retreated to where he had been standing with his friends.

The vehicle went a few blocks farther and then stopped at a red light at the corner of Sixth and R Streets, N.W. There, McClellan again approached the rear of the car. Smith indicated that he looked at McClellan through the rear window of the vehicle and that there was nothing blocking Smith's "view of [McClellan's] gun, his arms, his shirt and his face." Using the same silver, chrome gun Smith had seen a few minutes earlier,

McClellan fired three shots into the vehicle. Smith grabbed the door and the lock and attempted unsuccessfully to grab Cole's shirt. McClellan paused, and then fired another four shots into the back seat of the car, striking Cole. After the four shots, Smith kicked the car door open and ran away through a gap between the cars parked nearby. As Smith ran from the vehicle, toward 7th Street, he saw McClellan running the other way, inferably on R Street, until he turned onto Fifth Street, N.W.

Defense counsel was not permitted to cross-examine Smith about an incident a week earlier at Dunbar High School in which he and decedent Cole shot at McClellan and others because Smith declined to testify about that incident on Fifth Amendment grounds. Accordingly, the testimony of government witness Karlyles Spencer is worthy of special note.

Spencer testified that on the morning of September 5, 1991, Spencer and Cole encountered McClellan, Raymond Rouse, and another friend of McClellan's named Germane, outside the D.C. Armory where they had gone to get their class schedules. McClellan and Cole exchanged angry words and were "looking at each other hard, looking him down." They moved close to each other as if preparing to fight when a security guard arrived and prevented it. Later that day Cole, Smith, Spencer, Raymond Bigelow, and Billy Davis drove by Dunbar High School in a stolen black Jeep. Cole was in the right front seat of the Jeep and Smith was on the right side of the back seat. Spencer sat in the back seat behind the driver, Bigelow, while Davis sat in the middle of the back seat. At the corner of New Jersey and O Street, Cole and Smith shot guns out of the windows of the Jeep. Five specified individuals, including McClellan, were standing in the area near Dunbar High School at which Cole and Smith were shooting.

On cross-examination, Spencer acknowledged that Cole had asked him to go along with him in the Jeep. Defense counsel asked him about whether the Jeep was a stolen vehicle, pressed him on whether certain individuals had stolen that Jeep and turned it over to Cole, elicited that Cole was armed

with an automatic pistol and that Smith was armed with a small .380 automatic, and established that eleven to twelve shots were fired from the Jeep. Defense counsel also elicited that before the drive-by shooting Spencer went with Cole and others to Cole's grandmother's house and that when Cole went into the house he had only one gun but that he came out with two guns. Spencer testified that before they returned in the Jeep to Dunbar for the drive-by shooting, Cole gave one of the guns to Smith. Cole told Smith at the time that he shouldn't be scared, and Smith said "I'm gonna get mine."

Spencer acknowledged that at the time of his testimony he knew that Smith had a charge pending as a result of the drive-by and that he, Spencer, had gotten immunity from that charge. He also acknowledged later giving a statement to Smith's lawyer exonerating Smith from responsibility for the drive-by shooting and stated that the statement was a lie but not given under oath.

On redirect, Spencer testified that McClellan was a friend of "Truck," a person who was with McClellan at the Armory and at the time of the drive-by shooting. Spencer stated that during the events at the Armory it was "[his]" group (Cole, Spencer, et al.) against their group ('Truck,' McClellan, et al.)."

Ayanna Grant testified that a week later on September 12, 1991, she, her sister Shantia Moore, Wayne Smith, and Leonard Cole were driving around in her mother's white Hyundai Excel. They drove by Dunbar High School where she saw McClellan outside, wearing "[a] dark shirt, I believe it was green; it had white stripes in it around an inch thick and some other colors, but I couldn't make them out." After hearing a noise like firecrackers, Grant looked behind her car where she saw "an arm and part of the shirt sleeve" holding "something silverish, shiny." When asked, Grant answered that she could not see the person's face "[b]ecause it was over [the] top of the car." She further indicated that the shirt sleeve looked the same as the shirt McClellan was wearing, and that the complexion of the skin on the arm she saw was like McClellan's complexion.

Thereafter, Shantia Moore, Grant's sister, gave testimony about the events of September 12, 1991, culminating in the shooting of Cole. Moore said that after Cole was shot she first got out of the car and then got back in and drove the car to Seventh Street, N.W. She saw Cole lying across the back seat; Cole told her he had been hit. The police arrived shortly thereafter. Moore described the person she had seen on the street as a young, short, dark-skinned, black male wearing a white shirt with stripes.

Teddy Ford testified that at about 1:00 p.m. on September 12, 1991, he was leaving Dave's Carryout at the corner of New Jersey and R Streets, N.W. He heard approximately five gunshots and saw McClellan about a block away running toward Fifth Street with a gun in his hand. The gun "looked silver" and "[l]ike a .38 semiautomatic." On cross-examination, Ford could not remember what McClellan had been wearing on the day of the shooting, but Ford testified that on March 30, 1992, when he testified before the grand jury, he told the truth when he said that the person with the gun was wearing "a red and white striped shirt with a colorful hat on his head and blue jeans."

The court admitted into evidence photographs of the scene that were taken by Sanjeev Modi, a defense investigator. Modi testified that, in the photograph taken from the sidewalk outside Dave's Carryout, a person standing at the corner of Fifth and R Streets appeared "almost like a speck of dust on the picture," but acknowledged that the 3x5 inch print did not depict what the naked eye would see.

Odean Horne testified that on September 12, 1991, he had been stopped at the red light at Sixth and R Streets, N.W., when "all of a sudden a young man appeared at the front right fender of my car ... and he just came up, raised his hand—both out like this—with a gun in it." Horne then watched the young man fire three shots into the white Hyundai that was also stopped at the red light. The shooter then moved forward to the passenger window, and pumped four additional shots into the rear passenger compartment. He said that the shooter had been wearing a

"stripey shirt, as I would say blue and white, uh, or black and white." Two weeks later, Horne selected two individuals from an array of nine color photographs as most strongly resembling the shooter, indicating that one bore a better resemblance than the other. According to witness Detective Bell that photograph was of McClellan. Horne, however, could not identify McClellan at trial as the shooter.

## II.

■ McClellan argues, first, that the trial court erred in allowing Wayne Smith to testify for the government while denying McClellan, over objection, the opportunity to cross-examine Smith for bias after Smith had invoked his Fifth Amendment privilege against testifying concerning the previous altercation. Similarly, McClellan contends the trial court erred in failing to strike Smith's testimony. We disagree. The jury was made fully aware of Smith's role in the previous shooting incident, and the marginal advantage to the defense of having the jury hear about it from Smith himself does not warrant reversal.

We begin our analysis by considering how counsel for appellant McClellan framed the Confrontation Clause issue before the trial court, and how the court responded to counsel's requests. Before the trial began, the trial judge had a lengthy discussion with counsel, including witness Smith's counsel, about how McClellan's right to confrontation and witness Wayne Smith's Fifth Amendment rights could be accommodated. When the prosecutor raised the question about what would happen "if [Smith] is going to invoke his Fifth Amendment privilege—" the court immediately said "[t]hen you cannot use him as a witness." The prosecutor then informed the court that defense counsel would be in a position to cross-examine fully another witness (Karlyles Spencer), "an immunized witness who [McClellan's counsel] can ask everything he wants" concerning the other incident, *i.e.,* the drive-by shooting that Smith and decedent Cole allegedly perpetrated the week before Cole's murder.

The court in turn asked defense counsel how he would be prejudiced by that procedure. Counsel replied that the defense would be prejudiced "[b]y our inability to expose this witness' familiarity with weapons," and Smith's "utter disregard for justice and for truth-telling and his credibility," but made no specific reference to bias.

After counsel for the witness Smith confirmed that Smith would assert the privilege only as to the earlier drive-by shooting and the events of the thirty to sixty minutes that preceded it, the court asked Smith's counsel "What about questions regarding who he was friends with, who he was not friends with? Obviously there can be some cross-examination or full cross-examination as to bias...." The prosecutor interjected that witness Smith had waived his Fifth Amendment privilege in that regard before the grand jury.

The court continued to ask defense counsel to explain how his "cross-examination [would be] unfairly limited by [Smith's] assertion of the Fifth regarding the prior shooting," and finally requested the specific question that the defense would ask. Defense counsel responded that he would like to inquire whether Smith on the day of the murder "remained upset" about what happened the week before and Smith's interest in keeping Leonard Cole from getting Smith implicated in that case.

Further colloquy left the court, understandably, "not clear as to how [defense counsel's] cross-examination is materially hindered by the fact that we know [Smith] is going to take the Fifth on questions about the first shooting." Eventually the court made a preliminary ruling, saying:

> Why don't we assume at this point that I will permit Mr. Smith to testify along the lines set with the understanding that it does hinder somewhat [the defense]'s ability to fully cross-examine; however, I don't think it is very material. It just is sort of another factor to challenge the witness with under circumstances where the jury is going to learn what the factor is, and, indeed, it will virtually be stipulated to, whether or not you can reach a formal stipulation, but if the Government is saying it in their opening statement and then putting him on, and if they are sponsoring a witness that is going to come in and say

that Mr. Smith was the shooter, you will have all that to argue to the jury in terms of assessing Mr. Smith's credibility. So, I don't think that the prejudice to you is so extreme that a material eyewitness should be kept off the stand.

The court added:

I think it is a very difficult [issue], but when we are dealing with someone who is unquestionably an eyewitness in the sense that [he was] present and was there to make an identification and I gather probably the strongest identification witness to some extent; in other words, it is not terribly redundant. I mean, if there was a confession here and it became unnecessary, if there was a lot of other evidence, but it is an essential witness in an important case, and the limits on cross-examination, it seems to me, by the assertion of the Fifth [Amendment] are more apparent than real and that it is not any serious prejudice in the ability to cross-examine.

■ Although aware before the trial actually began that the court would permit Smith to testify while at the same time successfully asserting his Fifth Amendment privilege regarding the drive-by shooting, defense counsel did not request that McClellan's trial be continued to a date after the trial of Smith, then scheduled to take place about two months later. Nor did he suggest that the government give Smith use immunity regarding his testimony concerning the previous incident.[1] He did, however, note his general objection to the way in which the court proposed to handle Smith's testimony.

During opening statement the prosecutor informed the jury of the basis for concluding

that Smith was biased against McClellan when he told the jury that Smith and Cole had fired shots at McClellan and his friends during a September 5, 1991, drive-by shooting near Dunbar High School. Then, during direct examination, Smith admitted that, at about 11:00 p.m. on the day of Cole's murder, he had been "arrested and charged for allegedly participating on September 5, 1991 in a drive-by shooting at Dunbar High School." The government also established that Smith had been indicted and was scheduled to go to trial two months later, on November 17, 1992.

Prior to cross-examination, Smith invoked his Fifth Amendment privilege to remain silent and declined to answer questions concerning the September 5, 1991, drive-by shooting at Dunbar High School. The court instructed the jury just before cross-examination of Wayne Smith began:

As you have previously learned, this witness, Mr. Smith, is presently charged himself in the first shooting that occurred at Dunbar on September 5, 1991, and he has a trial scheduled on those charges in the near future. In light of those pending charges Mr. Smith has a constitutional privilege against incriminating himself as to those charges. Mr. Smith has asserted that privilege. This means he may refuse to answer any questions which may tend to incriminate him as to the first Dunbar shooting on September 5th.

Because of Mr. Smith's assertion of this privilege, I have ordered both lawyers not to ask any questions of Mr. Smith pertaining to his involvement in this September 5, 1991 shooting at Dunbar High School.

---

1. We are satisfied that the trial judge did not err, much less commit plain error, by failing to inquire of the government whether it could obtain an order of use immunity for Smith. During the discussion concerning Smith's assertion of his Fifth Amendment privileges, neither party suggested use immunity for Smith. We are unwilling to say, based on this record, where defense counsel made a rather weak showing of why cross-examination of Smith about the first shooting was necessary, that the court *sua sponte* should have discussed the option of a continuance in order for the government to obtain an order of use immunity. *See Carter v. United States*, 684 A.2d 331, 344–45 (D.C.1996) (en

banc) ("If immunity of the crucial defense witness is then sought, the defendant must first establish to the trial court's satisfaction that the proposed testimony is (a) material, (b) clearly exculpatory, (c) non-cumulative, and (d) unobtainable from any other source. These conditions are mandatory."). Here, although the cross-examination of Smith regarding the drive-by shooting might have helped to demonstrate his bias, we cannot say that he was the "crucial defense witness," nor can we conclude that his testimony was "unobtainable from any other source" where Spencer testified in detail about the first shooting.

We conclude that the trial court did not abuse its discretion in limiting cross-examination of Smith in a way that honored Smith's Fifth Amendment privilege and that McClellan's Sixth Amendment Confrontation Clause rights were not violated. We are satisfied that the trial court gave due weight to the government's right to present evidence, the defendant's Sixth Amendment right to confront adverse witnesses, and the witness' Fifth Amendment privilege.

It is not disputed that the trial court had good reason to honor Smith's Fifth Amendment claim. It is also not disputed that " 'when a conflict arises between a witness' proper exercise of his Fifth Amendment privilege against self-incrimination and the defendant's right to confront witnesses, a proper balance must be struck.' " *Johnson v. United States,* 418 A.2d 136, 140 (D.C.1980) (quoting *United States v. Gould,* 536 F.2d 216, 222 (8th Cir.1976)). Here, such a balance was struck and there was no Confrontation Clause violation because McClellan was afforded extraordinarily complete and effective substantive means of showing bias notwithstanding the limitation on his cross-examination. *See Elliott v. United States,* 633 A.2d 27, 32 (D.C.1993) ("After sufficient cross-examination has been allowed to satisfy constitutional requirements, the trial court retains broad discretion to determine the scope and the extent of cross-examination.") (citing *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990) (internal citation omitted)); *Beard v. United States,* 535 A.2d 1373, 1379–80 (D.C.1988) (witness' potential bias from plea agreement "was thoroughly explored before the jury" even though questions on sentencing hearing and first plea agreement were forbidden); *Johnson, supra,* 418 A.2d at 140 ("While the complete preclusion of cross-examination of a witness as to his bias or motive for testifying (assuming an appropriate proffer) is a clear denial of a defendant's Sixth Amendment confrontation right, anything less presents the issue of 'whether defense counsel had an opportunity to [adequately] bring out considerations relevant to motive or bias.' " (quotation and citations omitted)).

The only real bias issue related to Smith's hostility toward McClellan. This hostility was evinced by Smith's taking part in a drive-by shooting in which McClellan and those with him were shot at by Smith and the deceased Cole.[2] If defense counsel had been permitted to cross-examine Smith about the drive-by shooting, there are relatively few responses that might have been forthcoming. Most likely, defense counsel either would have secured an admission from Smith that he was so hostile to McClellan that he shot at him on September 5, or would have encountered equivocation or denial on Smith's part which could have led the jury to conclude that Smith was not answering truthfully.

Instead, as the case was actually tried, McClellan had the following bases for arguing to the jury that Smith was hostile toward McClellan and thus might attempt to implicate him in the shooting of Cole in order to harm him: (1) the government conceded in its opening statement that Smith and Cole had committed the drive-by shooting at McClellan and those near him a week before Cole's murder—indeed, the government was anxious to put in evidence of the drive-by shooting in order to show McClellan's motive for later killing Cole; (2) the government called Karlyles Spencer, the immunized witness who had ridden along in the Jeep from which Cole and Smith had shot at McClellan and those around him, who gave detailed testimony about the drive-by shooting; (3) the jury was made aware of the fact that Smith had been indicted for the drive-by shooting;[3] and (4) the government reiterated in its closing argument that Smith had

---

2. The defense produced no evidence or other showing of support for a few other farfetched theories that it mentioned, *e.g.,* that Smith himself might have conspired to have Cole killed because he was afraid Cole would implicate Smith in the drive-by shooting and that Smith would want to shift blame for Cole's murder from himself to McClellan.

3. This is not to suggest that the indictment itself could be cited as evidence of Smith's guilt of the drive-by shooting, but rather that it was reasonable to assume, and even to ask Smith, whether he was angry at McClellan and others for cooperating with the government with respect to the indictment against Smith.

shot at McClellan and his friends in broad daylight a week before the murder of Cole.[4]

In addition, the defense had several other avenues available for cross-examining Smith on his bias against McClellan. For example, the defense could have asked Smith whether he anticipated that McClellan would be testifying against him at Smith's forthcoming trial in November, whether McClellan ran with a different crowd than Cole and Smith, and generally whether Smith was hostile toward McClellan. In short, there can be no question that McClellan had a completely adequate opportunity to bring to the jury's attention his bases for contending that Smith was biased against him, both because of the extraordinarily effective alternative means afforded him to present this drive-by shooting incident and because of other available means of showing Smith's bias.

■■■■ We reach this conclusion recognizing fully that limitations on cross-examination for bias are suspect because they may frustrate a defendant's attempt "to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). As we have noted, however, this does not mean that the right of cross-examination is "without limits." *Elliott, supra*, 633 A.2d at 32 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)). The controlling question is whether a "reasonable jury might have received a significantly different impression of [the witness'] credibility had [appellant's] counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436. "Confrontation Clause violations are found primarily where defendants have been given *no* realistic opportunity to

ferret out a potential source of bias." *United States v. Derr*, 301 U.S.App. D.C. 60, 64, 990 F.2d 1330, 1334 (1993) (emphasis in original). Limitations on cross-examination are not deemed an abuse of discretion so long as, despite the limitation, the jury has "available to it sufficient information to make a 'discriminatory appraisal of the witness's motives and bias.'" *United States v. Robinson*, 832 F.2d 366, 373 (7th Cir.1987) (citation omitted), *cert. denied*, 486 U.S. 1010, 108 S.Ct. 1739, 100 L.Ed.2d 203 (1988); *see Johnson, supra*, 418 A.2d at 141.

In *Beynum v. United States*, 480 A.2d 698, 707 (D.C.1984), we held the trial court did not commit reversible error in limiting cross-examination of the police officer who shot appellant. We noted that the officer's other testimony, in addition to the questionable circumstances of the shooting itself, "alerted the jury to the acute possibility that [the officer] might seek to 'slant his testimony in favor of the government' in order to defend his actions." *Id.* (quotation omitted). We concluded that "[t]he jury was aware of sufficient facts, and heard sufficient testimony, from which it could infer (and from which defense counsel could argue) bias." *Id.* (citations omitted).[5]

Here, the jury was afforded not merely "sufficient" information to make an appraisal of Smith's testimony, but an extraordinarily complete and substantive basis for evaluating what his motive or bias may have been in testifying against McClellan. The prosecutor's opening and closing statements, the extensive cross-examination of Smith which was permitted, and the lengthy direct and cross-examination of Spencer combined to show unequivocally that Smith's hostility toward McClellan was indeed powerful. In short, there was no shortage of "facts from which jurors ... could appropriately draw inferences relating to the reliability of the

---

4. We recognize that neither the opening statement nor the closing argument of government counsel of itself was evidence of Smith's bias against McClellan, but both served to focus the jury's attention on the evidence of Smith's hostility, and were, in effect, concessions by the government of Smith's animus against McClellan.

5. In *Beynum*, defense counsel was not permitted to ask the officer whether he gave a statement to an internal police department investigation to keep from losing his job and about defendant's federal civil suit against him alleging tortious use of excessive force. The officer did testify as to his knowledge of police guidelines regulating the use of weapons and that violation of these rules could lead to adverse employment consequences.

witness." *Davis, supra,* 415 U.S. at 318, 94 S.Ct. at 1111.

Appellant has cited us to no case in which a conviction was reversed because of a limitation on bias cross-examination where the jury was actually made aware of the significant reason why the witness would have been hostile to the accused. On the other hand, the result we reach here is consistent with the holding of the Fifth Circuit in *United States v. Viera,* 819 F.2d 498 (5th Cir.1987), because in both cases the witness' "potential bias and the reasons to doubt his credibility were effectively communicated to the jury." *Id.* at 502. In *Viera,* as was equally true here, "appellant was able to disclose to the jury by various means all the information he had wanted to present through cross-examination." *Id.* at 501. In short, "the desired testimony had been presented by other witnesses." *Id.* (citing *United States v. Balliviero,* 708 F.2d 934 (5th Cir.)), *cert. denied,* 464 U.S. 939, 104 S.Ct. 351, 78 L.Ed.2d 316 (1983). This holding of *Viera*—that the Confrontation Clause can be satisfied when information is before the jury despite a preclusion of cross-examination—supports affirmance here.

The appellant's reliance on our opinion in *Johnson, supra,* 418 A.2d at 136, is misplaced. There, a Martha Ellis was the complaining witness and one of only two witnesses who observed in its entirety her alleged armed robbery by Johnson. *Id.* at 141. Ellis asserted the Fifth Amendment when defense counsel asked her whether defendant Johnson had ever failed to pay for a quantity of marijuana that she sold to him (the defense theory being that Ellis accused appellant of armed robbery to retaliate against Johnson for his failure to pay). *Id.* at 139. The court ruled that absent that cross-examination, which one could reasonably assume might produce evidence of bias, "the jury ... would not be in possession of a sufficient amount of information concerning formative events" to allow a proper appraisal of motive and bias. *Id.* at 141.

6. To make *Johnson* the equivalent of this case, the government in *Johnson* would have had to present evidence sufficient to establish that Johnson had purchased a large quantity of marijuana

In this case, in direct contrast to *Johnson,* a hoped-for admission (or denial) by Smith of his participation in the drive-by shooting would not have added significantly to the "information concerning formative events" that the jury received.[6] *Johnson* does not support a finding of error here, but instead underscores the basis for concluding that there was no Confrontation Clause violation.

### III.

■ McClellan argues the trial court erred in overruling defense counsel's objection to questions eliciting the fact that Grant, Moore, and their family moved to North Carolina after Cole's murder out of fear they would be harmed. McClellan contends that this particular claim of fear lacked an evidentiary foundation, was irrelevant, and in any event was prejudicial beyond any probative value. McClellan also contends that the prosecutor's improper use of this "fear" evidence in closing argument warranted a mistrial. We consider these arguments together.

### A.

The prosecutor's first line of direct examination of Ayanna Grant established that at the time of trial she lived in North Carolina. Grant then recounted the events of September 12, 1991, including the shooting of Cole in the back seat of her mother's car. The prosecutor sought to remove the sting from the defense's inevitable impeachment of Grant regarding her prior inconsistent statement to the police, made shortly after the shooting on September 12, that she had been at school all morning. The prosecutor asked Grant:

Q: Now, Ms. Grant, how did you feel after this incident occurred?

A: Scared.

Q: How did you feel when you gave that statement [to the homicide detective]?

A: Scared.

from Ellis and failed to pay for it, included that account of events in its opening statement, and announced that it was prosecuting complaining witness Ellis for her crime.

Q: And when you gave that statement to the homicide detective, did you tell that homicide detective everything that you're telling the jury here?

A: No.

Q: And why didn't you tell the homicide detective everything that you're telling the jury here?

A: Because I was scared and I just wanted to get out of there.

Q: Now, after this incident occurred, ma'am did you leave this jurisdiction? Did you leave Washington, D.C.?

A: Yes.

At this point, defense counsel objected, and the court conducted a bench conference. The trial court ruled that "until and unless that issue [*i.e.*, failure to tell the whole truth to the homicide detective] is injected, I think its prejudice outweighs the probative [value]." Defense counsel, however, injected that issue on cross-examination by asking the witness about her untruthful statement to the homicide detective, asking whether she considered herself a "good enough liar that you can trick homicide detectives" and then elicited testimony that Grant had lied "so [her] mother wouldn't get upset because she thought [she] was in school the whole morning."

On redirect, over defense counsel's objection, the prosecutor was permitted to elicit testimony that Grant had moved to North Carolina because she was afraid. The prosecutor first asked Grant how she felt about testifying. Grant responded, "Scared." The prosecutor then established that after the shooting, Grant had moved to North Carolina with her sisters and her mother; that her father had moved into his mother's house; and that "if this shooting had never occurred" Grant and her sister would still be living in Washington, D.C.

Comparable testimony was elicited from Moore, who also had previously told the police that Grant was in school all morning on September 12, 1991. The prosecutor then asked Moore about the move to North Carolina:

Q: Now, after this incident happened on September 12th, 1991, did you move from Washington, D.C.?

A: Yes.

Q: And did you move to North Carolina?

A: Yes.

Q: And why did you move?

A: I was scared for, for our lives.

■ Appellant contends the trial court erred in allowing this testimony of Grant and Moore and further erred in disallowing re-cross-examination of the women. We begin our analysis by noting that the scope of witness examinations is entrusted to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Mitchell v. United States*, 408 A.2d 1213, 1215 (D.C.1979) (direct examination); *Singletary v. United States*, 383 A.2d 1064, 1073 (D.C.1978) (recross-examination).[7]

The government contends that evidence of Grant's and Moore's fear was relevant to their motive for making the prior inconsistent statements to the homicide detective and for their delay in telling the truth. As the trial court initially noted, however, such testimony tends to be prejudicial because it suggests the witness fears reprisal at the hands of the defendant or his associates if she testifies.

It is not unnatural, however, for any witness to react self-protectively out of generalized fear for her own safety after witnessing a murder, even though the witness may not have received a direct threat. *Cf. Outlaw v. United States*, 632 A.2d 408, 409 n. 1 (D.C. 1993).[8] Thus, when, as here, the witness'

7. The government contends that, because defense counsel did not object to this line of questioning during the government's examination of Moore, this issue as to Moore should be reviewed for plain error. We disagree. Given the trial court's earlier ruling, it would have been pointless for defense counsel to renew its objection and may have been tactically disadvantageous to highlight the testimony for the jury. *See Wilkins*

*v. United States*, 582 A.2d 939, 942 n. 7 (D.C. 1990) ("An objection to evidence, once made and overruled, need not be renewed to the same type of evidence subsequently received.").

8. In *Outlaw*, evidence showed that witnesses to the shooting did not want to be interviewed at the scene apparently out of fear of reprisal. We noted that such a "reaction on the part of wit-

credibility has been attacked on the basis of her initial failure to tell the truth to the police, evidence that the real reason for her silence was such self-protective fear is not necessarily inadmissible. Under the circumstances, we think it appropriate to defer to the trial judge's exercise of discretion. But that does not end the matter for we must go on to consider the government's use of the fear issue in its closing argument.

### B.

The standards for evaluating claims of prosecutorial impropriety are well-defined. First, we must determine whether any or all of the challenged comments by the prosecutor were improper. If we conclude that they were, we must then, viewing the remarks in context, "consider the gravity of the [impropriety], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case."

*Peoples v. United States,* 640 A.2d 1047, 1056 (D.C.1994) (quoting *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991) (quoting *Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989) (other citations omitted))).

McClellan contends that the prosecutor overstepped the bounds of proper argument by suggesting, erroneously, that Grant really saw the killer's face and by capitalizing on the testimony regarding Grant's move to North Carolina to suggest that she had reacted out of fear of a killer who knew she could identify him. We agree with McClellan's point. The prosecutor argued:

PROSECUTOR: Who else told you the defendant was the killer? Ayanna Grant told you the defendant was the killer. [S]he told, she told you in not so many words, but she told you the defendant was the killer.

\*      \*      \*      \*      \*      \*

PROSECUTOR: And [Grant] told you about the killer. When the killer started shooting into that car on the rear window, rear passenger window, she told you it's the defendant. And how did she tell you?

She told you the shooter had the same shirt on that the defendant was wearing. The killer had the same complected skin and the killer had the same build as the defendant, but she didn't see his face.

Do you believe her that she didn't see his face? I leave that for your judgment. But consider this.

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

PROSECUTOR: When I asked her do you see Chris McClellan here in the courtroom, did you see how she identified him? She got up there and she went like this. She pointed her finger weakly over there, wouldn't look at him and said he's over there.

I ask you when she fled to North Carolina, when her parents moved her to North Carolina, when she uprooted her life from her[e], her whole life from D.C. to move to North Carolina out of fear, was it a fear because she saw that shirt or was it a fear because she knew who did it and saw that face?

Was her parents' fear because she didn't see the face? Or was the parents fear that they knew she'd seen the face and that she knew who did it? And she told you in the closest way she could without having to say it was the defendant's face. But she didn't have to, ladies and gentlemen, she didn't have to.

Grant actually testified:

Q: Now, the person that you saw, what did you see of the person that was standing next to the car?

A: I saw an arm and part of the shirt sleeve.

Q: And did you see the face of this person?

A: No.

Q: And why weren't you able to see the face?

A: Because it was over [the] top of the car.

nesses who had just observed a cold-blooded murder on the street, however, was hardly surprising; the instinct for self-preservation is well-nigh universal." 632 A.2d at 409 n. 1.

McClellan argues, first, that the prosecutor's statements warrant reversal because "the prosecutor's argument constituted a clear misstatement of the evidence, and, as such, was misconduct." *See Lewis v. United States,* 541 A.2d 145, 147 (D.C.1988); *see also Jones v. United States,* 512 A.2d 253, 258 (D.C.1986). The government responds that, in most of the instances cited, the prosecutor was merely making "reasonable comments on the evidence," *Tuckson v. United States,* 364 A.2d 138, 142 (D.C.1976), and arguing "all reasonable inferences from the evidence adduced at trial." *Streater v. United States,* 478 A.2d 1055, 1058–59 (D.C.1984).

We agree with McClellan that the government went too far when it asked the jury to infer, in direct conflict with Grant's sworn testimony, that Grant had seen McClellan's face and was afraid of retaliation since she could identify him as the shooter. The prosecutor was asking the jury to draw inferences that the evidence simply would not bear. Nothing indicated Grant and her family would have had more reason to fear McClellan if Grant had identified his face than they had because she identified his shirt. Thus, the argument was improper,

and McClellan's objection to it should have been sustained.[9]

■■■ But we are not persuaded that the government's improper argument injected reversible error into the proceeding. It is reasonable to assume that the jury was quite capable of evaluating what was placed before it here. Defense counsel responded to the prosecutor's argument that Grant stopped short of identifying McClellan as the shooter only because of fear by emphasizing in his closing argument that, in fact, Ms. Grant had never identified the defendant as the perpetrator. The trial court instructed the jury that the arguments of counsel were not evidence. *See McGrier, supra,* 597 A.2d at 41 (one factor we consider is effect of any corrective action by the trial judge). Jurors are presumed to follow the court's instructions, *Hairston v. United States,* 497 A.2d 1097, 1103 (D.C.1985). Moreover, it is obvious to the observer of the criminal justice system that jurors do not accept uncritically everything a prosecutor says in argument. The prosecutor did not intimate that he had any source of knowledge that McClellan made a threat that was outside the record. *Cf. Stewart v. United States,* 101 U.S.App. D.C. 51, 54–55, 247 F.2d 42, 45–46 (1957) (where the

---

9. McClellan also contests the admission into evidence, over defense counsel's objection, of Odean Horne's (an eyewitness) and Grant's grand jury testimony as prior consistent statements. To admit transcripts of grand jury testimony, two hearsay hurdles must be overcome. Horne's and Grant's actual testimony before the grand jury is, in itself, out of court statements offered for the truth of the matter as asserted to the grand jury. Additionally, the grand jury transcript admitted into evidence is also a hearsay document offered to prove, as fact, that each witness said the words contained in the document on the day he or she testified before the grand jury. The prosecutor did not ask Horne and Grant (or any other sworn witness) what his or her grand jury testimony was.

Prior recorded testimony is admissible only when the proponent establishes, among other things, that the direct testimony of the declarant is unavailable. *Feaster v. United States,* 631 A.2d 400, 405 (D.C.1993) (quoting *Skyers v. United States,* 619 A.2d 931, 933–34 (D.C.1993) (quotation omitted)). In this case, both Horne and Grant were available at trial. The prior recorded testimony exception was therefore inapplicable to justify direct admission of the transcripts. Accordingly, even if the substance of the grand jury

testimony was admissible pursuant to the prior description or rehabilitation exceptions, the grand jury transcripts themselves were inadmissible hearsay.

The admission of these hearsay documents, however, was harmless error. Although defense counsel could not cross-examine the witnesses regarding their grand jury testimony without recalling the witnesses, counsel could have done so. As we have noted in previous cases, "'the objection to the introduction of prior consistent statements is at bottom based on the principle of irrelevance ... [T]herefore, the harm that may occur ... is less serious than the inadmissible introduction of clearly prejudicial evidence.'" *McKenzie v. United States,* 659 A.2d 838, 841 n. 9 (D.C.1995) (quoting *Jordan v. United States,* 633 A.2d 373, 377 (D.C.1993)). Here, each witness was extensively cross-examined on closely related issues. The trial court, in admitting their grand jury testimony under the rehabilitation exception, instructed the jury that the prior consistent statements were admitted only to assist the jury in assessing the truthfulness of each witness' testimony at trial. Finally, although the testimony contained in the transcripts addressed the key contested issue in the case—identification—neither Horne nor Grant was ever able positively to identify the shooter.

government so implied regarding a witness' credibility). Nor was this a case in which the government made a complex argument for the first time in rebuttal, advancing an argument not based in record evidence that the defense never had a chance to meet. *See, e.g., Coreas v. United States,* 565 A.2d 594, 599–604 (D.C.1989). Finally, we note that the government had a strong case against McClellan and that while the prosecutor's improper statement concerned Grant's not making an identification and thus was closely related to the issue of guilt, Grant had already identified the shirt and arm of the shooter in a description matching McClellan. *See McGrier, supra,* 597 A.2d at 41 (factors to consider include gravity of the impropriety, its relationship to issue of guilt, ... and strength of government's case). Considering the relevant factors, we conclude that the prosecutor's argument did not result in reversible error.[10]

In sum, we conclude that there was no violation of the Confrontation Clause or abuse of discretion in the limitation on cross-examination of the witness Smith, but that there was impropriety in closing argument which the trial court did not fully remedy but which, in light of all the relevant factors, resulted in harmless error. Therefore, we affirm.

FARRELL, Associate Judge, concurring.

I join Judge Belson's opinion for the court. The confrontation issue is a close one. In the case of a key government witness like Smith, claimed to have proven his bias against McClellan by shooting at him a week before the alleged murder, barring cross-examination of Smith about that act raises serious Sixth Amendment concerns. Even if the jurors no more than eyeballed Smith and listened to his voice as he admitted, denied, or equivocated about the shooting, this might have contributed to their sense that he was an unreliable accuser of McClellan.[1] Nevertheless, as Judge Belson demonstrates, the

single dominant proof of Smith's hostility, the shooting, was conceded. The prosecutor did not mince words, telling the jury in summation: "Wayne Smith shot at the defendant and his friends a week before this murder in broad daylight." Karlyles Spencer described Smith's role in the shooting with particularity; the jury knew that Smith was awaiting trial for the shooting; and it further knew that he had "taken the Fifth" about it at this trial, *cf. Bowles v. United States,* 142 U.S.App. D.C. 26, 31–32, 439 F.2d 536, 541–42 (1970), despite the judge's explanation that Smith had a right to—"he may"—assert the privilege. There is not the slightest reason to doubt that the jurors knew Smith had been a co-shooter at McClellan and his companions a week before the murder and factored that proof of hostility into their appraisal of his credibility.

The Supreme Court has said:

[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, *and thereby* "to expose to the jury *the facts* from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

*Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (emphasis added) (quoting *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)). The test is whether "[a] reasonable jury might have received a *significantly different* impression of [the witness's] credibility had [the defendant's] counsel been permitted to pursue" the prohibited cross-examination. *Id.* (emphasis added). In every case I know of that has found constitutional error in a restriction on cross-examination for bias, it is because the jury never learned a significant reason why the witness might have been hostile to the ac-

10. We find no merit in McClellan's further claims that the prosecutor's closing argument improperly appealed to the passions and prejudices of the jurors, commented on the credibility of witnesses, and argued facts not in evidence with respect to means and opportunity.

1. On the other hand, defense counsel's suggestion at one point below that from hearing Smith cross-examined about the earlier shooting the jury might have entertained the reasonable possibility that *he* killed Cole is far-fetched.

cused.[2] That reason, *i.e.*, the motivation to testify falsely, would have enabled the jury to evaluate the assertion that the witness *did* testify falsely or at any rate should not be believed. But in this case the reason why Smith was hostile to McClellan barely counted. Appellant proffered no such reason beyond the one the jury already knew fully, Smith's friendship with the victim Cole, who had exchanged angry words—including threats to kill—with McClellan outside the D.C. Armory earlier on September 5. Nor is it plausible to think Smith would have volunteered a reason on cross-examination. Far more likely is that he would have denied or equivocated about the shooting, denying he had been party to it at all or that he had intended to shoot McClellan. What mattered from the standpoint of bias, in short, was the *fact* of Smith's hostility toward McClellan as demonstrated by the shooting itself. And the inference of that hostility was abundantly available to the jury from the information it had.

Of course, watching Smith equivocate or otherwise give demeanor evidence of his bias in reply to questions about the shooting could have added to the jury's knowledge. But, like Judge Belson, I am not persuaded the jury might have received a "significantly different impression" of Smith given what it already knew about the shooting and from which it "could appropriately draw inferences relating to [his] reliability." *Van Arsdall, supra.* Also, appellant was able to confront Smith fully about the fact that he was awaiting trial for the earlier shooting and about any benefit he hoped to get from the government by testifying. And McClellan cross-examined Smith over some 60 transcript

pages about the events of the Cole slaying and about his close friendship with Cole since childhood.

In these circumstances, to find constitutional error here, as Judge Ferren would, is to say that the prior shooting was so exceptional an indicator of Smith's bias that any even incremental advantage McClellan might get from questioning him about it was required by the Confrontation Clause. But that is not the constitutional test, as I understand it, and so I agree with Judge Belson that appellant's right to confront Smith was not violated.

\*　　\*　　\*　　\*　　\*　　\*

The prosecutor's closing argument in regard to Ayanna Grant was a low blow. His assertion that only "fear because she knew who did it and saw that face" kept Grant from identifying appellant expressly was unsupported by evidence and invited the jury to assume as evidence the ultimate fact to be proven: that appellant killed Cole in Grant's presence, terrifying her. The impropriety was only mitigated, not excused, by the fact that the prosecutor did not also imply that he had evidence that McClellan had threatened the witness. But I agree that this impropriety does not justify reversal. The government's case was not weak. McClellan, having apparently angered Cole enough at the Armory to cause Cole to shoot at him, had a strong motive to shoot Cole in retaliation. An eyewitness to the killing, Horne, saw the shooter (whom he could not identify) leave the scene and head up R Street toward Fifth Street; another witness, Ford, who knew McClellan, saw him running along R Street toward Fifth Street holding what resembled a .38 caliber pistol seconds after gunshots

2. *See, e.g., Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435; *Davis v. Alaska, supra; Jenkins v. United States,* 617 A.2d 529 (D.C.1992); *Brown v. United States,* 683 A.2d 118 (D.C.1996); *Johnson v. United States,* 418 A.2d 136 (D.C.1980); *Springer v. United States,* 388 A.2d 846 (D.C.1978); *Webb v. United States,* 388 A.2d 857 (D.C.1978); *Henry v. Speckard,* 22 F.3d 1209 (2d Cir.), *cert. denied,* 513 U.S. 1029, 115 S.Ct. 606, 130 L.Ed.2d 517 (1994); *Wright v. Dallman,* 999 F.2d 174 (6th Cir.1993); *United States v. Lankford,* 955 F.2d 1545 (11th Cir.1992); *United States v. DeSoto,* 950 F.2d 626 (10th Cir.1991); *United States v. Jones,* 766 F.2d 412 (9th Cir.1985); *Carrillo v. Perkins,* 723 F.2d 1165 (5th Cir.1984); *United*

*States v. Mayer,* 556 F.2d 245, 247 (5th Cir.1977); *Merritt v. People,* 842 P.2d 162 (Colo.1992) (en banc); *People v. Wilkerson,* 87 Ill.2d 151, 57 Ill.Dec. 628, 429 N.E.2d 526 (1981); *Haeger v. State,* 181 Ind.App. 5, 390 N.E.2d 239 (1979); *State v. Brady,* 381 So.2d 819 (La.1980); *State v. Senegal,* 316 So.2d 124 (La.1975); *State v. Hoard,* 180 W.Va. 111, 375 S.E.2d 582 (1988). These cases are to be distinguished from those in which confrontation error was found based on curtailment of cross-examination about prior bad acts of the witness reflecting on his character trait of veracity. *E.g., Lawrence v. United States,* 482 A.2d 374 (D.C.1984).

were heard from the direction of the killing. Cole was shot with a .38 caliber handgun. Grant, even discounting the prosecutor's embellishment of her testimony, stated that Cole's shooter wore a shirt matching the one McClellan had worn minutes earlier when Grant saw Cole and McClellan exchange words in front of Dunbar High School. And Smith, credibility warts and all, identified McClellan as the killer. Recognizing also that defense counsel was able to correct the record about Grant's testimony in his closing argument, I agree that the prosecutor's misstatements were not prejudicial enough to warrant reversal.

FERREN, Associate Judge, dissenting:

I respectfully dissent for three reasons: (1) the trial court erroneously denied McClellan, over objection, the opportunity to cross-examine Wayne Smith for bias after Smith had invoked his Fifth Amendment privilege against self-incrimination, and thus erroneously denied the defense motion to strike Smith's testimony; (2) as the majority agrees, the trial court erred in allowing the prosecutor, over defense objection, to argue in closing that Ayanna Grant "had seen McClellan's face and was afraid of retaliation since she could identify him as the shooter," *ante* at 552; and (3) these errors were not harmless. I therefore would reverse and remand for a new trial.

## I.

Before beginning cross-examination, defense counsel, out of the presence of the jury, asked Smith the following questions:

Q: Mr. Smith I'd like to ask you a bunch of questions about your whereabouts on September 5, 1991 when there was a ride-by shooting perpetrated outside of Dunbar High School. Will you answer those questions truthfully if I put them to you?

\*    \*    \*    \*    \*    \*

Q: Were you present with Leonard Cole on that day when Leonard Cole perpetrated a ride-by shooting at Dunbar High School?

Smith invoked his Fifth Amendment privilege to remain silent and declined to answer both questions.

"The guaranteed opportunity to cross-examine adverse witnesses is an inherent component of the defendant's Sixth Amendment right of confrontation." *Scull v. United States*, 564 A.2d 1161, 1164 (D.C.1989). This right to cross-examine, however, does not guarantee the defendant the right to any cross-examination the defendant requests. *See id.* In particular, when a witness asserts the privilege against self-incrimination, the trial court must weigh a defendant's right to cross-examine the government witness against the witness's Fifth Amendment privilege. *See Johnson v. United States*, 418 A.2d 136, 140 (D.C.1980). All parties agree that Smith properly asserted his Fifth Amendment privilege in this case. Appellant McClellan contends, however, that the trial court erred in allowing Smith to testify while denying the defense, over objection, the opportunity to cross-examine Smith on his potential bias against McClellan, and later in denying the defense motion to strike that testimony.

"Bias is always a proper subject of cross-examination, and the alleged bias or unreliability of a witness is never a collateral issue." *Scull*, 564 A.2d at 1165 (citations omitted). Moreover, "[w]hen the alleged bias involves the chief government witness in a criminal case, as it does here, '[t]he opportunity to present evidence of bias becomes particularly important.'" *Hollingsworth v. United States*, 531 A.2d 973, 979 (D.C.1987) (quoting *Benjamin v. United States*, 453 A.2d 810, 811 (D.C.1982)). Furthermore, "a defendant is allowed greater scope in questioning a witness as to his bias and motive than with respect to his general credibility." *Johnson*, 418 A.2d at 140.

McClellan sought to advance the theory that Smith, not Cole, had been responsible for the September 5, 1991, shooting at McClellan and his group. The defense, therefore, attempted to establish that McClellan did not have a motive to shoot at Cole. Additionally, and more importantly, McClellan wished to show that Smith had demonstrated his hatred of McClellan by

shooting at him on September 5, 1991, and that this hatred had motivated Smith to accuse McClellan falsely of carrying out the September 12, 1991, shooting of Cole.[1] McClellan therefore contended that the trial court's ruling violated his Sixth Amendment right to confront Smith and elicit his bias.

The government disputes McClellan's premise; it contends in its brief that the trial court's ruling "did not preclude appellant from impeaching Smith's credibility by specifically questioning him about his bias toward appellant or about any motive Smith may have had for wanting to kill Cole." True: defense counsel could have asked Smith, "You hate McClellan, don't you?" But without the possibility of the obvious followup question—"You shot at McClellan and tried to kill him on September 5, 1991, didn't you?"—the initial question undoubtedly would be pointless given Smith's likely denial. As the Supreme Court expressed in *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) (emphasis in original):

> While counsel was permitted to ask Green *whether* he was biased, counsel was unable to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial.... On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the *reliability of the witness.*

Alternatively, the government argued at trial, and stresses again on appeal, that McClellan had other ways to demonstrate Smith's bias. The government cites the trial court's announcement to the jury that Smith was awaiting trial for the drive-by shooting on September 5, 1991, and had invoked his right to silence in connection with that shooting. This particular substitute for cross-examination does not serve the purpose. If McClellan could show that Smith very likely was guilty of the drive-by shooting, then McClellan would have a basis for arguing that the shooting reflected Smith's hatred of McClellan, which had led Smith to testify falsely against McClellan in the death of Cole. But the fact of Smith's indictment and upcoming trial could not be used to demonstrate his guilt. The court instructed the jury at the end of the case that an "indictment is not evidence. It is merely a formal way of accusing a person of a crime in order to bring that person to trial. Do not consider the indictment as any evidence of the guilt of the defendant and do not draw any inference of guilt from it." Although this instruction referred to the indictment of McClellan in this case, there is no reason to believe the jury would have—or properly could have—thought the indictment against Smith was to be treated any differently. Thus, the indictment could not be used to suggest that Smith's hatred of McClellan was evidenced by a drive-by shooting.

At most, the fact of the indictment could be used to suggest that Smith was angry at McClellan because—presumably—McClellan or his confederates must have supplied information to the police that led to that indictment. This surely was a lesser basis than actual guilt of the drive-by shooting would be for imputing enough bias to Smith to suggest a willingness to perjure himself to "get" McClellan. Moreover, this lesser basis for bias is further weakened because the underlying assumption—McClellan's involvement in the indictment process—is undermined to some extent by Smith's voluntarily surrendering himself to the police, an action as consistent with claimed innocence as with admitted guilt. In sum, the indictment could not serve as a basis for demonstrating the kind of intense hatred of McClellan, reflecting bias, that the shooting itself would have reflected.

Nor can the fact that the government did not dispute McClellan's theory that Smith had shot at McClellan on September 5 satisfy McClellan's right to confront Smith. The prosecutor's opening statement indicated that Smith and Cole were together during the September 5 shooting, but it did not

---

1. The prosecutor acknowledged before trial that "obviously the bias issue would be, 'Well, you shot at my client a week before, and now you are here testifying to get him in trouble again.' "

indicate who the target was or whether Smith himself had shot at McClellan. Even if the opening statement had linked Smith to shooting McClellan, the prosecutor's statements were not evidence and the jury was instructed to decide the case on the evidence presented, not on the statements of the lawyers. Just as a party cannot be forced to stipulate to a fact instead of presenting evidence to prove the fact, the government's position on the September 5 shooting cannot be used to prevent McClellan from electing to cross-examine Smith. *See United States v. Washington,* 227 U.S.App. D.C. 184, 193–94, 705 F.2d 489, 498–99 (1983) ("Stipulations as to testimony are frequently not as effective in communicating facts to the jury as in-court testimony, and the government has a large measure of discretion in deciding to accept or reject an offer to stipulate"); JACK B. WEINSTEIN ET AL., WEINSTEIN'S EVIDENCE ¶ 403.04[3] (1997).

The government adds, however, that the defense had adequate opportunity to show Smith's role in the September 5, 1991 drive-by shooting—and thus to expose his hatred of McClellan—through the testimony of Karlyles Spencer, who told the jury that Smith in fact had been the shooter. We previously rejected a similar argument. In *Johnson,* 418 A.2d at 139, the defendant sought to prove that the complaining witness, Martha Ellis, who testified that the defendant had robbed her, had fabricated her testimony in revenge for the defendant's failure to pay for marijuana he had purchased from her. *See id.* At trial, "when defense counsel attempted to cross-examine [Ellis] along this line, the witness repeatedly invoked her Fifth Amendment privilege against self-incrimination" and declined to answer. *Id.* at 141. After objecting to this limitation, Johnson tried to show such bias circumstantially by introducing photographs of marijuana growing in Ellis's apartment and by questioning another witness, Milton Blue, who lived in the apartment with Ellis, about the alleged marijuana sales. *See id.* at 139. Blue "denied ever engaging in a marijuana transac-

tion with appellant." *Id.*[2] This court held that Johnson did not have to settle for this second-best approach to proving bias, and we reversed Johnson's conviction:

> While appellant possessed, and fully exercised, a right to present extrinsic evidence in support of his theory, he also had an unquestioned right to develop his case through cross-examination of the government's witnesses, for there could be nothing more basic to appellant's attempt to demonstrate *from her own testimony* that Ms. Ellis did indeed have a very strong motive for being hostile towards and testifying against him. Without such evidence before the jury, they would not be in possession of a sufficient amount of information concerning formative events to allow them to make a discriminating appraisal of the witness' motive and bias.

*Id.* at 141 (emphasis added) (citations omitted).

Indeed, the Supreme Court has recognized the power of confrontation, in contrast with indirect evidence; it has ruled that the Confrontation Clause protects the defendant's opportunity to elicit the facts necessary to establish bias by actual cross-examination of adverse witnesses, not merely through evidence from third parties. *See Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) ("the focus of the Confrontation Clause is on individual witnesses"); *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam) (noting that Confrontation Clause right of effective cross-examination allows factfinder to assess reliability of testimony by observing "witness's demeanor under cross-examination"); *Davis,* 415 U.S. at 316, 94 S.Ct. at 1110 ("The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.") (quoting 5 J. WIGMORE, EVIDENCE § 1395, at 123 (3d

---

**2.** It is unclear whether Blue testified that *he* had never sold marijuana to Johnson (implying that the marijuana in the apartment belonged to Ellis and, thus, bolstering Johnson's theory that Ellis's

testimony was biased), or that no one in the apartment had ever sold marijuana to Johnson (weakening Johnson's bias theory).

ed.1940)); *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965) ("a primary interest secured by [the confrontation clause] is the right of cross-examination").

The problem here is not that the defense was prevented from getting its bias theory before the jury, absent cross-examination of Smith about the September 5, 1991 drive-by shooting. Rather, the defect in this "alternative means of doing so" argument is, very simply, that the defense had no opportunity to confront the witness personally. When cross-examination is so limited, the jury has no opportunity to assess the reaction—the demeanor—of a key witness when that witness is confronted not only with an accusation of bias but also with the factual basis that supports the accusation. Although the trial court's ruling did not prohibit the defense from asking Karlyles Spencer questions to establish the factual predicate for its bias theory (*i.e.*, Smith shot at McClellan), Spencer would have had no basis for knowing Smith's mental and emotional state and could not supply the reaction that Smith himself would convey if confronted directly with questions about the drive-by shooting. In

sum, where the defense was precluded from exploring its bias theory through effective cross-examination of Smith himself, the trial court's allowing McClellan to establish Smith's bias through alternative means did not satisfy McClellan's right to confront Smith. *Cf. Maryland v. Craig*, 497 U.S. 836, 846, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990) (Confrontation Clause purposes served by "physical presence, oath, cross-examination, and observation of demeanor by the trier of fact"); *Jones v. United States*, 441 A.2d 1004, 1006 (D.C.1982) ("The confrontation clause also gives defendants the right to have the jury observe the demeanor of witnesses against the accused.").

The cases the government relies on for curtailing cross-examination are distinguishable from this case in significant respects. Some of them concerned limitations of the defendant's cross-examination on purely collateral matters.[3] In another, the cross-examination for bias was not substantially curtailed.[4] In still another case, the defendant did not seek to cross-examine the witness for bias but, rather, sought only to introduce extrinsic evidence to impeach the witness's

---

**3.** *See United States v. Lord*, 711 F.2d 887, 892 (9th Cir.1983) (error to strike testimony where witness refused to provide names of cocaine suppliers she introduced to defendant); *United States v. Humphrey*, 696 F.2d 72, 75 (8th Cir. 1982) *cert. denied* 459 U.S. 1222, 103 S.Ct. 1230, 75 L.Ed.2d 463 (1983) (no error in refusing to strike testimony when witness refused to answer questions related to other crimes that allegedly took place at time witness identified defendant); *United States v. Nunez*, 668 F.2d 1116, 1122 (10th Cir.1981) (single precluded question was "collateral to the matters raised on direct examination"); *United States v. Gould*, 536 F.2d 216, 222 (8th Cir.1976) ("If the witness's refusal to testify merely precludes inquiry into an area relating to a collateral matter, such as the credibility of the witness, the defendant has suffered no prejudice and the witness's other testimony may be admitted"); *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir.) ("[w]here the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him."), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963).

**4.** *United States v. Viera*, 819 F.2d 498 (5th Cir. 1987), *affirmed en banc*, 839 F.2d 1113, 1114

(5th Cir.1988), is fundamentally distinguishable from the situation presented here. The trial court in *Viera* precluded defense counsel from exploring one particular line of bias cross-examination but allowed extensive cross-examination regarding a nearly identical bias theory, such that the bias at issue was effectively pursued. Viera was convicted of "conspiring to distribute cocaine and for aiding and abetting Ernest King, Jr. in completing the underlying substantive offense." *Id.* at 499. At trial, defense counsel sought to establish that the government's key witness, Ernest King, Jr., was biased because he had sought favorable treatment from prosecutors both in his upcoming sentencing for the drug offense underlying Viera's case and in his prosecutions for two extraneous drug offenses. King invoked his Fifth Amendment privilege only with respect to the two drug offenses that were unrelated to Viera's case. *Id.* at 500. The trial court "permitted extensive cross-examination of King concerning both his plea bargain and his agreement that he would testify against appellant before being sentenced." *Id.* at 502. Accordingly, because the trial court did not materially prevent effective cross-examination for the kind of bias the defendant sought to prove, the appellate court held that "the trial court did not abuse its discretion in limiting appellant's cross-examination of King." *Id.* at 502.

testimony.[5] The government, therefore, provides no sound basis for avoiding an inevitable result: the trial court erred in allowing Smith to testify while precluding McClellan from effectively cross-examining Smith for bias. *See Jenkins v. United States* 617 A.2d 529, 532 (D.C.1992); *Scull*, 564 A.2d at 1166; *Ford v. United States*, 549 A.2d 1124, 1126 (D.C.1988); *Johnson*, 418 A.2d at 141.

The government potentially could have avoided the problem by bringing Smith to trial first so that he no longer retained a Fifth Amendment privilege at a later McClellan trial. I do not know what practical problems, if any, foreclosed this course of action.[6] If they were insurmountable, the government retained the options to offer Smith a plea satisfactory to him or, failing that, to consider whether immunizing him was an acceptable price for obtaining his critical testimony in a murder case. But the government should not have the benefit of Smith's key testimony, as the only eyewitness to the killing, without subjecting him to confrontation through cross-examination for bias; the government should not have been able to put Smith's identification testimony before the jury unless the defense had an opportunity to question Smith about the apparent rivalry between Smith and McClellan—a rivalry that resulted in shootings by each group at the other a week apart, the latter causing death.

The trial court therefore erred, in my judgment, in limiting the defense to "alternative means" of eliciting the information McClellan could have sought through cross-examination of Wayne Smith.

## II.

Because McClellan's constitutional right to confrontation was abridged by cutting off an entire line of cross-examination for bias, *Chapman*'s harmless error test applies. *See Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438; *Jenkins*, 617 A.2d at 532–34.[7]

Identification was the key issue in this case, and the government's case was not exceptionally strong. Wayne Smith—whose testimony should have been disallowed or stricken—was the only witness who testified that he had been able to see McClellan's face during the crime. Smith's testimony, however, was substantially impeached by evidence of his indictment and upcoming trial for the September 5, 1991 drive-by shooting and by Karlyles Spencer's testimony that Smith had been the one who shot at McClellan. As a consequence, the impeaching evidence mitigated, to some extent, the trial court's constitutional error, since that evidence supplied at least some of the information that cross-examination itself might have accomplished. Given, however, the compelling legal precedent that "alternative means" of achieving the objects of cross-examination cannot be held sufficient because they are not likely to be as effective as personal confrontation, I cannot say these mitigating factors purged the court's error of all significant harm. The erroneous admission of Smith's testimony without cross-examination for bias was still a serious minus for the defense and a corresponding plus for the government.

This negative impact on the defense cannot easily be dismissed as harmless beyond a reasonable doubt, because the government obtained the benefit of Smith's unequivocal identification of McClellan as the shooter—when there was no other identification evi-

---

5. *See United States v. Brown*, 634 F.2d 819, 824 (5th Cir.1981) (invocation of marital privilege precluded defendant from using wife's proffered testimony to impeach husband/witness).

6. I cannot accept the majority's implication that McClellan's failure to seek a continuance until after Smith's trial, or to urge the government to grant Smith use immunity, somehow affected the strength of McClellan's argument. It is not the defendant's responsibility to tell the government how to sequence its trials or whom to immunize; it is the government's responsibility to make those decisions and to accept the consequences that flow therefrom.

7. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (harmless beyond a reasonable doubt). In contrast, "[w]hen this court determines that the cross-examination allowed was consistent with the defendant's sixth amendment right to confront the witnesses against him [or her], we will focus on the scope of cross-examination allowed, and will not reverse the trial court's determination absent an abuse of discretion." *Beard v. United States*, 535 A.2d 1373, 1379 (D.C.1988).

dence of that quality—without the burden of defense counsel's personal confrontation of Smith about his bias. The other government witnesses described what they could see of the person who shot Cole by referring only—and inconsistently with one another—to many different kinds of colored shirts, not to a face. There also was conflicting testimony about the color and caliber of the gun used in the shooting. And, a number of government witnesses were impeached with prior inconsistent statements, or by the admission of photographs of the crime scene tending to discredit their testimonies. In sum, Smith's identification evidence was the government's most direct, and thus most powerful, evidence of guilt that otherwise was far from clear. I must conclude, therefore, that the error in admitting Smith's testimony without adequate cross-examination for bias was not harmless beyond a reasonable doubt.

### III.

Finally, I do not agree with my colleagues that the prosecutor's "improper" argument—that "Grant had seen McClellan's face and was afraid of retaliation since she could identify him as the shooter"—did "not … inject[ ] reversible error into the proceeding." *Ante* at 553.

As was true on very similar facts in *Lewis v. United States*, 541 A.2d 145, 147 (D.C. 1988), "the prosecutor's argument constituted a clear misstatement of the evidence and, as such, was [error]."

The defects in the government's identification evidence against McClellan make the prosecutor's improper reliance on the testimony about the Grant family's fear of McClellan especially damaging. In its general instructions before the jury retired, the trial court did instruct the jury that the statements of counsel were not evidence, but "[c]urative judicial instructions … do not always eradicate the harm." *Powell v. United States*, 455 A.2d 405, 411 (D.C.1982). That general instruction was not a cure here. The trial court earlier had overruled defense counsel's objection to the prosecutor's erroneous argument that Ayanna Grant had seen the shooter's—McClellan's—face. The prosecutor then had elaborated upon the argument, impermissibly buttressing Grant's identification by contending that Grant's fear and her move to North Carolina had prompted Grant to say, falsely, that she had not seen the shooter's face, despite Grant's undisputed testimony to the contrary. The prosecutor's closing argument, therefore, was highly prejudicial in view of the government's problematic case. The defense was hampered not only by the court's restricting cross-examination for bias of the only eyewitness, Smith, but also by the court's allowing the prosecutor to enhance Grant's identification of McClellan by arguing that Grant had seen McClellan's face.

Because I would reverse for the trial court's constitutional error in refusing to strike Smith's testimony, I need not evaluate whether the prosecutor's misuse of the evidence in closing argument—standing alone—could have been nonconstitutional harmless error. For completeness of analysis, however, I do not hesitate to add my view that the error was not harmless; I cannot say the error did not "substantially sway" the verdict. *Peoples v. United States*, 640 A.2d 1047, 1056 (D.C.1994) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

I would reverse and remand for a new trial.