Antoine D. ISLER, Appellant,

v.

UNITED STATES, Appellee.

No. 94–CF–1362.

District of Columbia Court of Appeals.

Argued April 8, 1999.

Decided May 20, 1999.

Charles F. Daum, Arlington, VA, for appellant.

Sarah T. Chasson, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Assistant United States Attorney, were on the brief, for appellee.

Before TERRY, FARRELL, and REID, Associate Judges.

FARRELL, Associate Judge:

A jury found appellant (Isler) guilty of armed first-degree murder and related offenses for the shooting death of Donald Brown. Against formidable identification testimony, Isler's defense was that a third person, Derrick Twyman, had killed Brown mainly in retaliation for a prior shooting of Twyman by Brown, whereas no reason had been shown for Isler to kill Brown. Attempting to neutralize this defense, the prosecutor called Twyman as a witness in rebuttal, and he testified that he was elsewhere playing basketball at the time of the charged shooting.[1] He further stated that he did not know who had shot him on the previous occasion. Nevertheless, outside the jury's presence, he was allowed to exercise his Fifth Amendment privilege with respect to any cross-examination about the prior shooting or his relationship with Brown. Despite that restriction, the prosecutor asked the jury rhetorically in summation if Twyman "sound[ed] to you like a person who was telling the truth when he said he wasn't out there that day [i.e., when Brown was killed]? Did he sound sincere? Did he answer the questions that were asked of him?" And, in light of Twyman's denial that he knew who had shot him, the prosecutor questioned how he could have had a motive to kill Brown.

On appeal Isler contends, as he did below, that the curtailment of his ability to cross-examine Twyman abridged his Sixth Amendment right to confront an important witness against him. We agree, and because we are unable to conclude that the error was harmless beyond a reasonable doubt, we reverse his convictions and remand for a new trial.

1. A defense witness had claimed to see Twyman near the shooting scene earlier the same evening.

2. At trial Dews described the shooter as having worn a black shirt, black pants, black shoes, and a black head band. Chappelle confirmed that he was dressed "all in black."

I.

Brown was shot repeatedly while in a parking lot of the Linda Pollin Apartments complex at about 8:40 p.m. on August 30, 1993. His girlfriend, Patricia Walden, was with him and saw the shooting, as did two teenage girls, Shanta Dews and Vandora Chappelle, who were together looking out an apartment window at the time. All three witnesses knew Isler and positively identified him as the shooter. Dews did so the first time in a 911 call to the police moments later, and Walden did likewise in an interview with the police shortly thereafter.[2] The coincidence of immediate identifications by separate individuals (Dews/Chappelle and Walden) from different vantage points made this a strong government case.[3] At the same time, the government could prove no motive for Isler to have shot Brown.

The defense called a purported eyewitness to the shooting, Charles Alexander, who described the shooter as wearing a black hooded sweat shirt and black shorts. Although Alexander did not know the shooter's identity, he stated that he did not see him in the courtroom. Through other witnesses Isler attempted to show that Derrick Twyman might have been the shooter. Kenneth Brooks testified that he had seen Twyman in the Linda Pollin complex near the parking lot in question at about 7:15 on the evening of the shooting. Robin Beckford testified that Twyman and Brown had both been dating Patricia Walden at the same time, and that on one occasion in the early summer of 1993, she had seen Brown shoot Twyman in the ankle in Walden's presence, after which Twyman exclaimed, "The motherfucker shot me and it's because of you, bitch [i.e., Walden] .... I'm going to fuck him up." This followed an earlier occasion when

According to Walden, he wore a hat, a white tee shirt, and dark colored pants.

3. Only the barest reasons were suggested why any of the three witnesses, who all knew Isler, would choose to accuse him falsely.

Brown had also "started shooting at Derrick." Leatrice Wade likewise testified that Brown had shot Twyman twice and that, on the second occasion, Twyman said that "he['s] going to get that MF [*i.e.*, Brown]." The prosecutor on cross attacked Wade's failure to mention, in an earlier interview with him, the fact that "there was a running feud between Derrick Twyman and Donald Brown."

The government called Twyman as its lone rebuttal witness to explain his whereabouts at the time Brown was killed. Since it was apparent that Twyman would be questioned about the circumstances of the shooting and his prior relationship with Brown,[4] the trial judge summoned an attorney who was representing Twyman in a pending unrelated case. After consulting with Twyman about this case, the attorney stated that Twyman would refuse, on grounds of possible self-incrimination, to answer virtually any question about his activities at the time of the shooting or his past involvement with Brown. The trial judge, endeavoring to balance the "competing ... Fifth Amendment [right] of the witness," the "Sixth [A]mendment ... rights of the accused," and the government's right to offer evidence countering an issue raised by the defense, allowed the parties to question Twyman at length outside the jury's presence and ruled question-by-question on his exercise of the Fifth Amendment privilege. The outcome was that the parties would be allowed to question Twyman about his whereabouts at the time of the shooting, as well as whether he had known Brown and been intimate with Walden. But no questioning would be permitted about the following subjects:

— anything to do with "the nature of how [Twyman] knew [Brown] or what he knew about [him]," as well as his feelings about Brown;

— whether Twyman had ever threatened to injure Brown (or Walden); whether Brown had ever threatened him; and whether they had ever argued during the spring or summer of 1993;

— anything regarding "the circumstances of the [previous] shooting" or shootings, and whether Twyman had possessed a gun during the months before the shooting of Brown;

— whether Twyman and Brown had been rival drug dealers; and

— whether Twyman owned dark sweat clothes, a black cap or dark hood, or a white T-shirt.

Before the jury, Twyman testified on direct that he had been playing basketball at one location, then another, throughout the evening hours of August 30, 1993, but in neither case near the Linda Pollin complex. He also stated that he had been shot in the ankle in June 1993, but claimed he had not seen the person who shot him. When Isler's counsel began cross-examination by asking, "You're willing to answer all my questions?", the trial judge interrupted, reminded him of her ruling, and instructed the jury as follows:

> I've made certain preliminary rulings relative to Mr. Twyman. Mr. Twyman is here. He had no choice in the matter. Mr. Twyman, like every other citizen of the United States, also has certain Fifth Amendment rights.

In his closing argument, the prosecutor attacked Isler's defense directly, telling the jury that "[i]f you believe that Derrick Twyman killed Donald Brown, then you should find this man not guilty," but that to do so it would have to find that the government's witnesses—especially Walden—had lied in accusing Isler.[5] He stressed at length the credibility of Dews, Chappelle, and Walden, in contrast to the

---

4. Besides the reported prior hostility and violence between the two arising from their rival relationship to Walden, defense witnesses had testified that both were drug dealers in the area of the Linda Pollin complex.

5. As he stated, "Someone had to come in here and lie to you."

defense witnesses who, among other things, had come forward only at the eleventh hour to exculpate Isler. He further asked, rhetorically, whether Twyman did not "sound to you like a person who was telling the truth" and had not "answer[ed] the questions that were asked of him?" And he particularly noted that Twyman had said "he didn't know who shot him" on the earlier occasion, "[s]o how can we say he had a motive to kill Donald Brown?" In instructing the jury, the judge recited the defense theory that Twyman had threatened harm to Brown as a result of an earlier shooting, explaining that this evidence of motive, if believed, could be considered in deciding whether the government had met its burden of proof.

## II.

■ The issue before us is whether the trial judge struck a constitutionally permissible balance between the government's need for Twyman's testimony, Twyman's privilege against compelled self-incrimination, and Isler's right to confront by cross-examination the government's lone rebuttal witness. If the answer to that question is no, we must then decide whether the error was harmless or not under the standard of *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The first issue is not, as sometimes appears from Isler's brief, the clash between a *defendant's* Sixth Amendment right to call witnesses and the Fifth Amendment privilege of a witness.[6] In that conflict "[t]he Fifth Amendment privilege ... prevails, though a collision between the two amendments should be avoided if feasible." *Carter v. United States*, 684 A.2d 331, 336 (D.C.1996) (en banc). Rather, the issue here is whether the government's need to call a witness who it recognized (or at least now does not dispute) faced the reasonable

possibility of incriminating himself through cross-examination should have yielded to the accused's right to confront a witness against him—the government being forced to the choice of forgoing the testimony or immunizing the witness.

The trial judge prohibited any cross-examination of Twyman about his purported reason to kill Brown and, in the sequel, to devise an alibi to conceal his guilt. The judge did so while allowing Twyman on direct examination both to state his alibi and substantially to deny the imputed motive by admitting he had been shot previously but denying that he knew who had done it. The subject of a feud between Brown and himself, and threats he had made to avenge the prior shooting(s), was placed entirely out of bounds. In addition, he could not be asked whether he owned clothing that witnesses had described as worn by Brown's killer.

■ "[T]he complete preclusion of cross-examination of a witness as to his bias or motive for testifying (assuming an appropriate proffer) is a clear denial of a defendant's Sixth Amendment confrontation right ...." *Johnson v. United States*, 418 A.2d 136, 140 (D.C.1980). As the Supreme Court has stated:

[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

*Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431 (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). No form of bias is more "proto-

---

**6.** Isler wastes a good deal of time arguing that the trial judge erred in not sustaining Twyman's initial blanket assertion of his Fifth Amendment right. The government fittingly responds that he has no standing to assert that right, *see, e.g., Lyons v. United States*, 683

A.2d 1080, 1084 (D.C.1996), and argues that in any event the judge correctly tested the witness's exercise of the privilege on a question by question basis. *See, e.g., Littlejohn v.. United States*, 705 A.2d 1077, 1082–83 (D.C. 1997).

typical" than a claimed motive of the witness to conceal his own culpability for the charged offense. *Cf. Davis*, 415 U.S. at 311, 94 S.Ct. 1105 (witness might have identified defendant "to shift suspicion away from himself as one who robbed the Polar Bar"). By allowing no cross-examination about this motive, particularly while letting Twyman effectively deny it by disclaiming knowledge of who had shot him, the trial judge denied Isler his right of confrontation. *See Johnson*, 418 A.2d at 141.

The government likens this case to *McClellan v. United States*, 706 A.2d 542 (D.C.1997), in which the court found no Sixth Amendment violation despite the trial court's preclusion of any questioning of a key government witness (Smith) about his having fired shots at the defendant a week before the charged murder. But the differences between *McClellan* and this case begin with the fact that the defense there did not seriously claim Smith, an eyewitness, had himself committed the murder. *See id.* at 548 ("The only real bias issue related to Smith's hostility toward McClellan"). Moreover, *McClellan* was an extraordinary case in that neither party disputed that Smith had shot at McClellan the previous week: a government witness described the episode at length, and the prosecutor acknowledged Smith's involvement in it both in opening statement and in summation. *See id.* at 549 (concluding, as a result, that the jury had "an extraordinarily complete and substantive basis for evaluating what [Smith's] motive or bias may have been in testifying against McClellan"). Here, by contrast, the prosecutor attacked the proof that Twyman knew his assailant and had threatened to retaliate against Brown, and, as noted, Twyman implicitly denied the threat and motive by denying that he knew who had shot him. Finally, whereas Smith was an eyewitness to the charged killing ("probably the strongest identification witness to some extent," *id.* at 547 (quoting the trial judge in *McClellan* )), Twyman's alibi testimony brought into play the trial

court's discretion even to allow rebuttal testimony, *see Owens v. United States*, 688 A.2d 399, 405 (D.C.1996), particularly if it meant a collision between the constitutional rights of the witness and the defendant.

### III.

Since we conclude that the trial court erroneously curtailed Isler's right of cross-examination, the remaining question is whether that error was constitutionally harmless. "The correct inquiry," the Supreme Court has stated, "is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431. Applying this formula is not as easy as it seems. If the hypothetical fully-realized potential of cross-examining Twyman about his motive would be an admission by him that his alibi was false—contrived to hide his motive and opportunity to kill Brown—then plainly the restriction on cross-examination was not harmless. But the chances that cross-examination would have yielded that admission must surely approach zero. More realistic is the possibility that while adhering to his alibi, Twyman would have conceded past hostility with Brown and even (despite denying on direct that he knew who had shot him) that he had threatened harm to Brown some months before the killing. At the least, the jury might have considered his denial of such hostility or threats as an evasion that raised questions about his alibi and, in turn, the government's focus on Isler.

■ The government, besides stressing the virtual absence of a reason for its witnesses to mistake Isler for Twyman or falsely accuse him, argues that the defense of Twyman's motive and opportunity was fully put before the jury through the defense witnesses, closing argument, and the trial judge's instruction on the defense theory. It asserts that the combination of

multiple identifications of Isler and the ability the defense had to implicate Twyman should convince us that the jury would not have changed its mind even if Twyman had been questioned on the forbidden subject.[7] The issue is a close one, but the government has not persuaded us beyond a reasonable doubt of the absence of prejudice, as it must.

Twyman was the last witness the jury heard, the government's sole rebuttal witness. If believed, his testimony that he was elsewhere at the time of the shooting effectively neutralized his purported motive to kill Brown. Although the defense was free to question him about the details of his alibi—with the notable exclusion of questions about his clothing—it could not confront him with his reason to fabricate that account or probe into his denial that he knew his assailant and so had a score to settle with Brown. The prosecutor in summation both pointed to that denial and cited Twyman's "sincer[ity]" in "answer[ing] the questions that were asked of him." In contrast to this seeming candor, jurors might well have wondered why in questioning Twyman the defense had shunned entirely the theme of its case—a puzzle not dispelled by the judge's bare reference to her "preliminary rulings" related to Twyman and the fact that he had "certain Fifth Amendment rights."[8] Finally, the government's case against Isler was strong but not overwhelming, given that no motive had been shown for him to kill Brown. And the defense that Twyman killed Brown, while not particularly strong, was not frivolous either. We deal with the broad curtailment of questioning of a witness who, though not part of the government's case originally, might have ended up impressing the jury as an important feature of the elimination of all reasonable doubt. In these circumstances, we cannot say that vigorous cross-examination of Twyman would have yielded no reasonable possibility of a different verdict.

For these reasons,[9] we reverse the judgments of conviction and remand for a new trial.

*So ordered.*

---

**7.** In *Jordan v. United States,* 722 A.2d 1257 (D.C.1998), cited by the government, we found constitutional harmless error in a restriction the trial court placed on the defendants' attempt to link a third person to the killing, explaining that the government's proof against the defendant chiefly affected was "compelling." (including identification testimony of three eyewitnesses) and that the defense theory largely *had* been presented to the jury. *Id.* at 1261–62. *Jordan* presented no issue of curtailment of the right to cross-examine a government witness, *cf. Curry v. United States,* 658 A.2d 193, 199 (D.C.1995) (restating importance of cross-examination in "the search for truth"), but we need not decide whether that difference matters because, as we explain in the text, we do not have the confidence we had in *Jordan* that the restriction imposed on Isler's defense did not affect the outcome.

**8.** In *McClellan, supra,* by contrast, we quoted the following lengthy instruction given by the trial judge before cross-examination of Smith:

As you have previously learned, this witness, Mr. Smith, is presently charged himself in the first shooting that occurred at Dunbar on September 5, 1991, and he has a trial scheduled on those charges in the near future. In light of those pending charges Mr. Smith has a constitutional privilege against incriminating himself as to those charges. Mr. Smith has asserted that privilege. This means he may refuse to answer any questions which may tend to incriminate him as to the first Dunbar shooting on September 5th.

Because of Mr. Smith's assertion of this privilege, I have ordered both lawyers not to ask any questions of Mr. Smith pertaining to his involvement in this September 5, 1991 shooting at Dunbar High School.

*McClellan,* 706 A.2d at 547.

**9.** Our disposition makes it unnecessary to consider Isler's other arguments on appeal, except that we find no error in the admission of Twyman's medical records showing when he had been shot in the foot.