*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-FS-1353

IN RE J.W., APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(DEL-217-18)

(Hon. Robert Okun, Trial Judge)

(Argued May 20, 2021                                           Decided September 2, 2021)

*Claire Pavlovic*, Public Defender Service, with whom *Samia Fam* and *Jaclyn S. Frankfurt*, Public Defender Service, were on the briefs, for appellant.

*Samson J. Schatz*, Assistant Attorney General, for appellee. *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Principal Deputy Solicitor General, *Carl J. Schifferle*, Deputy Solicitor General, *Graham E. Phillips*, Assistant Attorney General, and *Andrew J. Delaplane*, Assistant Attorney General, were on the brief for appellee.

Before GLICKMAN and MCLEESE, *Associate Judges*, and FISHER, *Senior Judge*.

MCLEESE, *Associate Judge*: After a bench trial, the trial court found that appellant J.W., who was a juvenile, was involved in offenses including murder and armed robbery. J.W. argues among other things that his constitutional right to cross-examine the witnesses against him was violated. We agree, and we therefore vacate the judgment.

**I.**

On December 18, 2017, police responding to an emergency call found sixteen-year-old J.A.S. lying on a sidewalk, without shoes on. J.A.S. had been shot twice and died from his wounds. Officers recovered shell casings and cartridges from a nearby basketball court. The casings and cartridges had all been fired from a single firearm.

Ten days later, Mr. J.M. contacted the police and claimed to have information about the shooting. Mr. J.M. was incarcerated in the D.C. Jail at the time. Evidence from recorded jail calls indicated that on the night of the shooting Mr. J.M. spoke with his twin daughters Mg. J. and Ml. J., who were fifteen years old, and their close friend K.C., who was around seventeen years old. In that conversation Ml. J. said that the group had seen the shooting, which had been committed by a group of older boys who lived "around our way." At the time of the shooting, J.W. was fifteen, the same age as the twins and younger than K.C. At no point in the conversation did anyone identify J.W. as having been involved.

Over the following weeks, Mr. J.M. had a number of phone calls with the twins or their aunt, Ms. P.J. In those phone calls, Mr. J.M. explained that his goal

was to exchange information about the shooting for a $25,000 reward and for a reduction in his sentence. When Mr. J.M. asked Ml. J. what she would tell the police, Ml. J. said that she did not know what had happened and that they needed to "figure out one story." Mr. J.M. told the twins that he did not want them to speak to the police until they had met with him first. Ms. P.J. said that she had told the twins not to speak with the police without their father present. Ms. P.J. emphasized the importance of getting the reward money and trying to help Mr. J.M. Ms. P.J. also indicated that she thought the reward money might be a blessing.

In January 2018, Mr. J.M. met with the police and said that his daughters had called him on the night of the shooting and told him that J.W. was the shooter. That statement was apparently false, because the twins did not identify J.W. as the shooter in the recorded conversations on the night of the shooting. Mr. J.M. said that he wanted reward money for his daughters and a sentence reduction for himself. Mr. J.M. indicated that he wanted to meet with the twins before they spoke to the police.

In a subsequent phone conversation with the twins, Mr. J.M. said that he was going to meet with Ml. J. in person; told Mg. J. to talk to Ml. J. and "follow the script"; said that he could not talk about it over the phone; and said that he would make sure they "get a cut."

Prosecutors and investigators met with the twins in March 2018, with Ms. P.J. present. They discussed both the reward money and sentencing benefits for Mr. J.M. The twins testified before a grand jury the same day.

Ms. P.J. testified at trial that on the night of the shooting she heard gunshots. Less than fifteen minutes later, Mg. J. and Ml. J. ran into her house crying hysterically. Ms. P.J. asked the twins what was wrong, and the twins said that J.W. had shot J.A.S. Ms. P.J. denied that the twins would lie for their father or that her testimony was affected by the $25,000 reward. Ms. P.J. acknowledged that she had spoken to J.W. about "mess[ing] with" Mg. J. and Ml. J., including in connection with stealing basketballs, food, a phone charger, and a bike.

Mg. J. testified as follows. Her friend J.A.S. was playing basketball with others when a group of older boys arrived and stole a basketball from somebody on the court. Sometime after that, J.W. and a person identified as C-Nut demanded J.A.S.'s sneakers, which were red Nike Air Jordans. J.W. pointed a gun at J.A.S.'s head, and J.W. and C-Nut attempted to remove J.A.S.'s sneakers. When J.A.S. resisted, J.W., C-Nut, and a third person fought with J.A.S. J.W. pulled the trigger, but bullets fell to the ground. Mg. J. told J.A.S. to run, which he did. J.W. followed J.A.S. and fired the gun from the edge of the basketball court. Following the

shooting, Mg. J. and others walked toward where J.A.S. had fled and saw J.W. walking with C-Nut, who was carrying J.A.S.'s sneakers. When they reached the twins' house, the group saw J.A.S. on the ground with blood on his shirt and his sneakers gone. Mg. J.'s uncle called the police and told the twins to leave before the police arrived. The twins left but returned to the house via an alley a few minutes later. Mg. J. did not speak to the police on the day of the shooting.

Mg. J. admitted that she loved her father and that he told her to be on board with his plan and follow the script. She denied, however, that he told her what to say to the police, and she also denied that she would falsely accuse someone of murder to help her father. She admitted to having falsely told the grand jury that she did not know the amount of the reward, but she denied that she would falsely accuse someone of murder for money. At the time of trial, Mg. J. faced four counts of robbery and armed robbery for allegedly stealing cell phones. The District stipulated that Mg. J.'s attorney had asked about possible benefits for Mg. J.'s testimony and had been told that Mg. J.'s cooperation would be taken into account. Mg. J. denied that she had any reason to dislike J.W., but did mention an incident in which J.W. had taken her sister's bike.

K.C. testified to having seen the shooting, and his account was largely consistent with Mg. J.'s account, although there were some differences on various details. K.C. identified J.W. as the shooter and described J.W. as wearing a green jacket. K.C. denied having any animosity toward J.W.

K.C. said that he and the twins were best friends and that he considered them to be like family. K.C. considered Mr. J.M. to be like an uncle, and K.C. had visited Mr. J.M. in jail. K.C. acknowledged that Mr. J.M. had told K.C. to tell the police that K.C. wanted Mr. J.M to come home. K.C. also acknowledged that Mr. J.M. had talked about splitting the reward money. K.C. denied, however, that Mr. J.M. had told him what to say in court.

Ml. J. was called by the defense as an adverse witness. She acknowledged that she was close to her father. She further acknowledged that her father had come up with a plan to get the $25,000 reward and to get early release from jail. She denied that she was influenced by that plan. Ml. J. acknowledged that she did not initially identify J.W. as the shooter in the jail calls, but she explained that she was aware that the calls were recorded and that she had not wanted to be a witness. Ml. J. acknowledged having had problems with J.W. in the past, including about a bike.

Ml. J. said, however, that she would not lie about J.W. and that she and J.W. got along.

Foreign DNA was found under J.A.S.'s fingernails, but J.W. was excluded as a contributor. The gun used in the shooting was later found as a result of an investigation into an armed robbery that occurred about a month after the shooting in this case. That robbery also involved a group of people who stole sneakers, among other things, and one of the robbers was wearing red Nike Air Jordans and a green jacket. Police discovered a gun during a search of the house of one of the robbers, and that gun ballistically matched the gun used in the shooting of J.A.S. The detective investigating the shooting of J.A.S. was not aware of the details of the later robbery and did not investigate whether any of the four people who pleaded guilty to that robbery might have been involved in the shooting of J.A.S. The detective also did not try to corroborate the twins' version of events or speak with anyone else who was present at the scene of the shooting, including K.C.

In written findings of fact and conclusions of law, the trial court acknowledged that J.W. had "raised a number of non-frivolous challenges to the evidence against him." The trial court concluded that Mr. J.M. had a plan for his daughters and K.C. to testify against J.W. in order to receive a reward and help Mr.

J.M get out of jail sooner. The trial court, however, credited the testimony of the twins and K.C. that they did not testify falsely to support that plan. The trial court stated that J.W. had not offered a plausible reason why the twins and K.C. would falsely accuse J.W. specifically. Although the trial court acknowledged inconsistencies in the testimony of the prosecution's witnesses, the trial court viewed those inconsistencies as mostly on unimportant matters. The trial court acknowledged that the twins did not identify J.W. as the shooter in their first call to Mr. J.W., but the trial court credited Ml. J.'s explanation that she was afraid to identify J.W. on a recorded call. The trial court also gave weight to Ms. P.J.'s testimony that the twins identified J.W. as the shooter soon after the shooting. The trial court acknowledged shortcomings in the investigation of the case and the lack of forensic evidence tying J.W. to the shooting, but the trial court did not view those circumstances as creating reasonable doubt.

## II.

J.W. argues that he was denied his constitutional right to demonstrate the bias of witnesses against him, arising from their unrelated criminal activity, and that the judgment therefore must be vacated. We agree.

**A.**

There was information indicating that Mg. J., Ml. J., and K.C. had all been involved in unrelated criminal activity. Mg. J. had been arrested in May 2018 and charged with offenses involving armed robbery. On recorded jail calls, K.C. discussed with Mr. J.M. that K.C., Mg. J., and Ml. J. had been involved in a series of robberies involving cell phones.

During cross-examination, Ms. P.J. acknowledged that Mg. J. had pending juvenile charges against her, including armed robbery. When defense counsel tried to ask about the underlying circumstances of those charges, however, the trial court ruled that the underlying circumstances were irrelevant. J.W. did not raise the ruling regarding Ms. P.J. as a separate point of error in his briefs on appeal, and we mention that ruling only to provide context for the remaining discussion.

J.W. also sought to question Mg. J. about her criminal activity. Mg. J. acknowledged that she had charges pending against her, including armed robbery. She denied that she was worried about those charges, however, and asserted her innocence. Defense counsel sought to cross-examine Mg. J. about the facts of the underlying cases, to undermine Mg. J.'s claim that she was not worried about being

found responsible in those cases. Defense counsel proffered that the facts of Mg. J.'s case were "really bad," and earlier evidence had indicated that Mg. J. was found with two stolen iPhones. The trial court precluded the questioning, ruling that Mg. J. had a Fifth Amendment privilege not to testify about the facts of the charges against her. Defense counsel was permitted to ask Mg. J. about the possible consequences of being found responsible in her pending cases, and Mg. J. acknowledged that she could possibly be removed from her home or sent out of state to a residential facility.

K.C. acknowledged that he was aware of the robbery charges against Mg. J. He denied that he was concerned that he might be also be charged with armed robbery, but he acknowledged that he was worried about the possibility of robbery charges. When asked about whether his concern related to the robberies Mg. J. had been charged with committing, K.C. invoked his Fifth Amendment privilege and refused to answer. K.C. also invoked the Fifth Amendment in response to questions about whether he had picked up and delivered money for Mr. J.M. and whether Mr. J.M. had asked K.C. to smuggle drugs to him in jail. Defense counsel argued that K.C.'s refusals to answer interfered with J.W.'s constitutional right to cross-examine K.C. and that K.C.'s testimony therefore should be stricken. The trial court ruled that K.C. had a valid Fifth Amendment privilege not to answer questions about the

unrelated criminal conduct. The trial court declined to strike K.C.'s testimony, concluding that J.W.'s constitutional right to cross-examine had been adequately protected because (1) the proposed cross-examination involved unrelated alleged criminal conduct and (2) J.W. had been able to cross-examine K.C. as to other forms of bias.

Finally, when J.W. called Ml. J. as an adverse witness, J.W. noted that, given the trial court's prior rulings, J.W. understood that he could not question Ml. J. about her involvement in the cellphone robberies.

**B.**

At the most basic level, the framework applicable to this case is well settled and undisputed by the parties. On one hand, the Sixth Amendment guarantees a criminal defendant's right to cross-examine adverse witnesses. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). "A respondent in a juvenile delinquency proceeding has an equivalent right as a matter of due process." *In re C.B.N.*, 499 A.2d 1215, 1218 (D.C. 1985). On the other hand, the Fifth Amendment protects a witness's right against compelled self-incrimination. *Isler v. United States*, 731 A.2d 837, 840 (D.C. 1999). When the prosecution calls a witness who asserts a valid

Fifth Amendment privilege to refuse to answer questions posed during cross-examination, the witness cannot be compelled to answer. *Id.* Rather, the options are: (1) the prosecution can provide the witness with immunity, so that the witness can answer the questions; (2) if the witness's refusal to answer does not impermissibly intrude on the defendant's Sixth Amendment right to cross-examine, the witness can testify and decline to answer; or (3) if the witness's refusal to answer does impermissibly intrude on the defendant's Sixth Amendment right to cross-examine, the witness's entire testimony is inadmissible. *Id.*

The parties dispute three more specific issues, however. First, J.W. takes the position that, in cases raising such issues, a witness's testimony must always be entirely precluded if the witness asserts a Fifth Amendment privilege to refuse to answer a question that the defendant would ordinarily have a Sixth Amendment right to ask. In other words, J.W. argues that the scope of his constitutional right to cross-examine is not affected by the fact that the issue arises in the context of a witness's valid invocation of a Fifth Amendment right not to answer. The District of Columbia argues to the contrary that in such cases the trial court has the authority to strike "a constitutionally permissible" balance among the prosecution's need for evidence, the witness's Fifth Amendment privilege, and the defendant's Sixth Amendment right to cross-examine. *Isler*, 731 A.2d at 840. On that view, a trial court in some

circumstances might appropriately permit a witness to testify even though the witness had refused to answer questions that the defendant ordinarily would have had a Sixth Amendment right to ask. We need not decide that issue. For reasons we explain, we conclude that the judgment must be vacated even if we assume that the witnesses' valid invocation of a Fifth Amendment privilege gave the trial court some latitude to curtail otherwise required cross-examination.

Second, the parties disagree about the proper concrete articulation of the scope of defendants' Sixth Amendment right to cross-examination. We are of course bound by the Supreme Court's guidance on the issue. The Supreme Court's most recent extended discussion of the issue is in *Delaware v. Van Arsdall*, 475 U.S. 673, 678-80 (1986). The Supreme Court noted that "the exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 678-79 (internal quotation marks omitted). Thus,

> a criminal defendant states a violation of the Confrontation Clause by showing that [the defendant] was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness.

*Id.* at 680 (ellipses and internal quotation marks omitted). In other words, a violation of the Sixth Amendment is shown if "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue [the] proposed line of cross-examination." *Id.*

The Supreme Court acknowledged, however, that

> trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant. . . . [T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Id.* at 680 (internal quotation marks and emphasis omitted).

In attempting to more specifically articulate the scope of the Sixth Amendment right to cross-examine, this court has used a wide variety of formulations, some of which do not seem even arguably equivalent. *See, e.g.*, *Howard v. United States*, 241 A.3d 554, 563 (D.C. 2020) ("Only when a trial court's limitation prohibits *all* inquiry into the possibility that a witness would be biased as a result of favorable treatment from the government is the Sixth Amendment

violated.") (brackets and internal quotation marks omitted); *Smith v. United States*, 180 A.3d 45, 51 (D.C. 2018) (Sixth Amendment precludes "a curtailment [of cross-examination] which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony"; "cross-examination concerning bias is particularly important where, as here, the credibility of the key government witness is the central factor to be weighed by the trier of fact") (brackets and internal quotation marks omitted); *Hagans v. United States*, 96 A.3d 1, 31 (D.C. 2014) (trial court may not "preclude a meaningful degree of cross-examination that allows the defense to pursue the proposed line of cross-examination in sufficient depth to elicit the nature and extent of the witness's bias") (internal quotation marks omitted); *Longus v. United States*, 52 A.3d 836, 850-51 (D.C. 2012) ("Bias is always a proper subject of cross-examination."; "A trial court ruling therefore infringes on the Sixth Amendment right to confrontation when it precludes the defense from pursuing a line of examination that is necessary to enable the jury to fully evaluate the witness's credibility. It is not enough that the possibility of bias be mentioned; counsel must be permitted to present the nature and extent of the bias.") (brackets and internal quotation marks omitted); *Coles v. United States*, 36 A.3d 352, 357 (D.C. 2012) ("Defense counsel must be able to elicit enough information to allow a discriminating appraisal of the witness's motives and bias.") (internal quotation marks and emphasis omitted); *McClary v. United States*, 28 A.3d 502, 503 (D.C.

2011) ("This court has found error where a trial court allows cross-examination into one area of potential self interest bias, but denies inquiry into another similar, but distinct and unrelated area of potential bias."); *Lewis v. United States*, 10 A.3d 646, 653 (D.C. 2010) ("If a defendant is permitted to elicit facts sufficient to enable defense counsel to argue to the jury that the witness is biased, there is no constitutional error."); *Johnson v. United States*, 960 A.2d 281, 303 (D.C. 2008) (trial court cannot "wholly deprive[] a defendant of any opportunity to cross-examine a witness on a central issue"); *Blunt v. United States*, 863 A.2d 828, 833 (D.C. 2004) ("Because of the central role cross-examination for bias plays, the court must accord such cross-examination wide latitude and must not unduly restrict it."; trial court "may not prohibit all inquiry about an event that a jury might reasonably have found caused bias") (brackets and internal quotation marks omitted); *Scull v. United States*, 564 A.2d 1161, 1166 (D.C. 1989) (Sixth Amendment right to cross-examine was violated where "there was a realistic chance that the proposed cross-examination had an impact on the outcome of the trial," because proposed cross-examination "might have led the jury to doubt dispositive testimony against appellant").

Rather than trying to wade through all of those varying formulations, we focus on the formulation used by the Supreme Court in *Van Arsdall*: a violation of the

Sixth Amendment is established if "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue [the] proposed line of cross-examination." 475 U.S. at 680. We focus on that formulation in this case not only because we are bound by the holdings of the Supreme Court but also because the District itself acknowledges that this formulation frames the "controlling question."

Third, the parties dispute the applicable standard of review. J.W. argues that our review of the rulings at issue is de novo. *See, e.g.*, *Brown v. United States*, 952 A.2d 942, 950 (D.C. 2008) (appellate court reviews limitations of cross-examination for abuse of discretion only after determining that trial court permitted sufficient cross-examination to meet requirements of Sixth Amendment). The District argues that our review is for abuse of discretion. *See, e.g.*, *McClellan v. United States*, 706 A.2d 542, 548 (D.C. 1997) (trial court "did not abuse its discretion in limiting cross-examination of [a witness] in a way that honored [the witness's] Fifth Amendment privilege"). We need not resolve this dispute either. Even if we assume that the rulings at issue are discretionary in character, we conclude that the trial court's rulings were outside the scope of that discretion.

## C.

We turn first to whether J.W.'s opportunity to cross-examine Mg. J. and K.C. was sufficient under the Sixth Amendment. When defense counsel attempted to cross-examine Mg. J. to show that the pending armed-robbery charges gave her a motive to curry favor with the prosecution, Mg. J. denied having such a motive, because she was innocent. Defense counsel was precluded from further cross-examination to test the credibility of Mg. J.'s response, despite the proffer that the evidence against Mg. J. was "really bad," and the evidence that Mg. J. had been arrested with two stolen cellphones on her person. We hold that the Sixth Amendment would ordinarily have entitled J.W. to cross-examine Mg. J. further about her flat denial that she had a motive to curry favor and her related claim of innocence. As we have explained, bias is not "a matter on which an examiner is required to take a witness's answer. Bias may be proved even after a witness's disavowal of partiality." *Martinez v. United States*, 982 A.2d 789, 795 (D.C. 2009) (internal quotation marks and ellipsis omitted); *see, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 317-18 (1974) ("While counsel was permitted to ask whether [the witness] was biased, counsel was unable to make a record from which to argue why [the witness] might have been biased . . . . On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the

jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness."); *Longus*, 52 A.3d at 850-51 (holding that defendant was denied Sixth Amendment right to cross-examine where defendant was permitted to ask witness about being subject of investigation but not about underlying facts or possible sanctions; "In determining what is 'meaningful' cross-examination, we have been solicitous of a defendant's right to effectively expose a witness's various biases to the jury.") (collecting cases).

For similar reasons, we also hold that J.W. would ordinarily have had a constitutional right to cross-examine K.C. further about both (1) K.C.'s denial that he was worried about being charged with armed robbery or with the same robberies for which Mg. J. had been arrested and (2) whether K.C. had been picking up and delivering money for Mr. J.M. and Mr. J.M. had asked K.C. to smuggle drugs into jail for him. On the latter point, one of the central questions at trial was whether K.C. was truthfully identifying J.W. as the shooter or instead was doing Mr. J.M.'s bidding as part of a scheme to get reward money and sentencing benefits for Mr. J.M. Information about the nature and extent of K.C.'s close relationship with Mr. J.M. was potentially quite relevant to that question. *Cf., e.g.*, *United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995) (evidence of alleged conspirators' other joint criminal activity was "clearly probative of the close nature of their relationship").

Thus, as to both Mg. J. and K.C., we conclude that "[a] reasonable [fact-finder] might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue [the] proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680. We are not persuaded by the District's arguments to the contrary.

First, the District argues that the Sixth Amendment is violated only if there is a complete preclusion of cross-examination as to bias, or if the limitation on cross-examination prevents defense counsel from arguing that the witness at issue was biased, or if all inquiry into a particular form of bias is prohibited. As noted above, some of our cases contain language that could be considered to support these arguments. As we have explained, however, our cases have used a number of seemingly quite different formulations in discussing the scope of the Sixth Amendment right to cross-examine. For reasons we have explained, we focus in this case on the formulation used by the Supreme Court in *Van Arsdall* and repeated in a number of our cases: whether the factfinder "might have received a significantly different impression of the witness'[s] credibility had [defense] counsel been permitted to pursue [the] proposed line of cross-examination." *McLellan*, 706 A.2d at 549 (quoting *Van Arsdall*, 475 U.S. at 680) (brackets and internal quotation marks omitted). Moreover, our holding in this case finds strong support in the outcomes

of *Davis* and a number of decisions of this court. *See, e.g.*, *Davis*, 415 U.S. at 309-18 (holding that Sixth Amendment was violated where defendant was permitted to ask some questions about whether witness might have feared prosecution but was not permitted to elicit that witness was on probation); *McClary*, 28 A.3d at 504 (holding that Sixth Amendment was violated where defendant was not permitted to cross-examine witness about juvenile cases, probation status, and recent arrest, even though defendant was permitted to cross-examine witness about immunity, initial refusal to cooperate, and other criminal conduct); *Blunt*, 863 A.2d at 834-36 (holding that Sixth Amendment was violated where trial court did not permit cross-examination of witness about out-of-jurisdiction charge, even though trial court permitted questioning about other forms of bias relating to witness's liberty interest).

Second, the District argues that further impeachment of Mg. J. about her pending criminal charges would not have given the trial court a significantly different impression of Mg. J.'s credibility. We disagree. Further cross-examination might have led the trial court to conclude that Mg. J. was not telling the truth when she denied fear of prosecution for armed robbery because she was innocent of those charges. Discrediting Mg. J.'s testimony on that important point could certainly have given the trial court a significantly different impression of Mg. J.'s credibility, not only on the narrower issue of whether Mg. J. had a motive to curry favor but also

more broadly. *See, e.g.*, *Hamilton v. Hojeij Branded Food, Inc.*, 41 A.3d 464, 481 (D.C. 2012) ("If a witness testifies untruthfully regarding one issue, it may not be unreasonable to infer that he or she was likewise less than candid with regard to other matters as well.").

The District argues, however, that any motive to curry favor could not have had much significance, because Mg. J. identified J.W. as the shooter before any motive to curry favor could have arisen. Specifically, the District points to evidence that Mg. J. identified J.W. as the shooter to Ms. P.J. on the night of the shooting and to the police in March 2018, both well before Mg. J. was arrested in May 2018. That is a relevant observation, but it has limited significance. There was evidence impeaching Ms. P.J.'s testimony about the identification on the night of the shooting, including bias evidence relating to Ms. P.J. and evidence that the twins had not identified J.W. as the shooter in their first call to Mr. J.M. Moreover, although Mg. J. was not arrested until May 2018, the record is unclear about when she might have feared that she was under investigation. More generally, if the trial court had determined that Mg. J.'s credibility was adversely affected by a motive to curry favor, that could have affected the trial court's assessment of the details of Mg. J's account as presented through her testimony at trial. Finally, the District's timing

point is limited to Mg. J. and does not address the significance of K.C.'s testimony, to which we now turn.

Third, the District argues that further impeachment of K.C. would not have given the trial court a significantly different impression of K.C.'s credibility. We again disagree. It is true that defense counsel was able to elicit evidence that K.C. was worried about the possibility of prosecution for an unspecified robbery, and there was significant evidence of K.C.'s close ties to Mr. J.M. and the twins. But K.C. denied that he feared prosecution for armed robbery, which could have led to K.C.'s being prosecuted as an adult. *See* D.C. Code § 16-2301(3)(A) (2012 Repl.) (person over sixteen charged with armed robbery is not child for purposes of delinquency statute). K.C. also refused to answer when asked if his fear of prosecution related to the same robberies that Mg. J. had been charged with committing, and he also refused to answer questions about his potentially criminal activities on behalf of Mr. J.M. We think that it is entirely possible that K.C.'s answers to questions on those topics could have significantly affected the trial court's assessment of K.C.'s credibility.

**D.**

As previously noted, we assume without deciding that the trial court might have had some discretion to refuse to strike the testimony of Mg. J. and K.C. even if their invocation of the Fifth Amendment privilege precluded J.W. from cross-examination that ordinarily would have been constitutionally required. Even on that assumption, we conclude that the judgment must be vacated. We view this case as similar to *Johnson v. United States*, 418 A.2d 136 (D.C. 1980). In that case, the defense theory was that the alleged victim of a robbery had fabricated the alleged robbery as revenge for the defendant's failure to pay for marijuana that the victim had sold the defendant. *Id.* at 139. The alleged victim invoked the Fifth Amendment privilege when cross-examined about whether the alleged victim and someone who lived with her had sold the defendant marijuana. *Id.* The defendant was able, however, to cross-examine the alleged victim more generally about marijuana in the alleged victim's apartment. *Id.* The trial court declined to strike the alleged victim's testimony. *Id.* We reversed, holding that the alleged victim's invocation of the privilege prevented the defendant from adequately exploring on cross-examination the theory that the alleged witness was hostile towards the defendant. *Id.* at 139-42. For similar reasons, we reach the same conclusion in the present case.

In declining to strike the testimony at issue in this case, the trial court relied on *McClellan*, 706 A.2d at 542. We do not view *McClellan* as supporting affirmance in this case. In *McClellan*, a government witness testified that he had seen the defendant shoot and kill the victim. *Id.* at 544. The defendant attempted to impeach the witness on the theory that the witness was hostile to the defendant, as evidenced by the fact that the witness was currently facing charges for having shot at the defendant. *Id.* at 548. The witness invoked the Fifth Amendment to refuse to answer questions on that topic, and the trial court declined to strike the witness's testimony. *Id.* at 545-47. The prosecution, however, conceded that the witness had in fact shot at the defendant, and the jury heard detailed evidence about the shooting and the witness's involvement. *Id.* at 547-49. This court affirmed, because "the jury was afforded not merely sufficient information to make an appraisal of [the witness's] testimony, but an extraordinarily complete and substantive basis for evaluating what his motive or bias may have been in testifying against McClellan." *Id.* at 549 (internal quotation marks omitted); *see also Isler*, 731 A.2d at 841 ("*McClellan* was an extraordinary case in that neither party disputed that [the witness] had shot at McClellan the previous week: a government witness described the episode at length, and the prosecutor acknowledged [the witness's] involvement in it both in opening statement and in summation."). Nothing remotely comparable occurred in the present case.

**E.**

For the foregoing reasons, we hold that J.W.'s constitutional right to cross-examine the witnesses against him was violated. We therefore must vacate the judgment unless the District can establish that the error was harmless beyond a reasonable doubt. *Isler*, 731 A.2d at 841; *see, e.g.*, *Hagans*, 96 A.3d at 18 ("The burden on the government to establish harmlessness beyond a reasonable doubt is a heavy one, but it is not necessarily insurmountable."). We conclude that the District has failed to meet that burden.

The parties appear to dispute the proper analysis of the harmless-error issue. J.W. argues that the error in this case was the failure to strike the testimony of the witnesses, and that error was surely not harmless given that that testimony was the sole evidence of J.W.'s guilt. The District argues that it could also prevail if it could show "that the restricted line of inquiry would not have weakened the impact of the witness's testimony." *Mason v. United States*, 53 A.3d 1084, 1095 (D.C. 2012) (brackets omitted). We need not resolve that dispute, because under either approach we cannot say that the error was harmless beyond a reasonable doubt.

The evidence against J.W. was far from overwhelming. No forensic evidence connected J.W. to the shooting. The DNA from J.A.S.'s fingernails excluded J.W. Police recovered the gun used in the shooting from an individual who committed a different armed robbery that also involved sneakers. That individual wore a jacket that matched K.C.'s description of the shooter and sneakers matching those stolen from J.A.S. As the trial court acknowledged, there was evidence suggesting that the investigation into the shooting was not thorough.

Given those circumstances, the case against J.W. turned almost entirely on the credibility of Mg. J. and K.C. The District plainly cannot carry the burden of showing beyond a reasonable doubt that the verdict would have been the same without those witnesses' testimony. We reach the same conclusion even if the question instead is whether the verdict would have been the same if those witnesses had answered the questions at issue instead of invoking the Fifth Amendment privilege. That question is of course difficult to answer, because we do not know how the witnesses would have answered the questions at issue. *Cf. Isler*, 731 A.2d at 841-42 (discussing difficulty of assessing harmlessness of curtailment of cross-examination). Given that the burden of showing harmlessness rests on the District, however, any uncertainties here weigh against a finding of harmlessness.

In this case, the defense raised substantial credibility issues with respect to the District's witnesses. In particular, the calls among Mr. J.M., Mg. J., Ml. J., K.C., and Ms. P.J. provided support for the theory that the witnesses had coordinated a story in a bid for leniency for Mr. J.M and for the $25,000 reward. The trial court found that such a plan existed, but concluded, based on the evidence it heard, that the prosecution's witnesses nevertheless had not falsely identified J.W. We are unable to conclude beyond a reasonable doubt that the trial court's verdict would have been the same if the defense had been able to cross-examine Mg. J. and K.C. more fully on the matters at issue. *See, e.g.*, *Cunningham v. United States*, 974 A.2d 240, 245 (D.C. 2009) "[C]ross-examination seeking to ferret out bias takes on enhanced significance where the credibility of the key government witness is in issue.") (internal quotation marks omitted).

As a postscript, we note that J.W. also challenges the admissibility of Ms. P.J.'s testimony that the twins identified J.W. as the shooter soon after the shooting. That testimony was admitted under the excited-utterance exception to the rule against hearsay. The District defends that ruling but also argues that the evidence was admissible under other theories. In light of our ruling vacating the judgment on other grounds, we need not address the admissibility of Ms. P.J.'s testimony. We decline to exercise our discretion to resolve the issue, because it is unclear who

would testify at any retrial and on what theory or theories such evidence might be admitted. *See, e.g.*, *Jackson v. Condor Mgmt. Grp., Inc.*, 587 A.2d 222, 226 (D.C. 1991) ("Since these issues may or may not arise again upon remand, we see no reason to resolve them here.").

## III.

For the foregoing reasons, the judgment of the Superior Court is vacated and the case is remanded for further proceedings.

*So ordered.*